Opinion for the Court filed by Circuit Judge TATEL.
TATEL, Circuit Judge:
In this damages action against three deputy federal marshals, the plaintiff alleges that the officers violated the Fourth Amendment when they used deadly force against him. The officers moved for summary judgment based on qualified immunity, the district court denied the -motion, and the officers now appeal. We reverse. Under the circumstances of this case, we conclude that the deputies violated no clearly established law and are therefore entitled to qualified immunity.
*135 I.
In January 2007, then sixteeri-year-old Michael Fenwick pulled into the parking lot of an apartment complex in southeast Washington, D.C. Close by were three deputy marshals — Andrew Pudimott, Jeremy Fischer, and John Mickle — waiting to enforce an eviction order. The deputies watched as Fenwick struggled and failed to properly park his car before entering an apartment building to look for his girlfriend. Given Fenwick’s youthful appearance and difficulty at the wheel, and observing that the car’s door lock was broken, the officers suspected that he was underage and driving a stolen vehicle. Before they could confirm as much, however, Fenwick reappeared and headed towards his car. Surveillance footage from nearby security cameras shows that, at that time, pedestrians were entering and exiting the apartment buildings, a car was pulling out of the apartment complex, and several other vehicles were passing on the adjacent street. The officers, still across the parking lot, called to Fenwick and asked to speak with him. Fenwick responded by pointing to his chest as if saying, “Who, me?” But instead of stopping to speak with the deputies, Fenwick got into his car and began backing up. The deputies rushed to surround the vehicle and, with guns drawn, ordered Fen-wick to halt. Fenwick ignored the order. Instead, although Deputy Pudimott was visible near the driver-side front of the vehicle, Fenwick drove forward towards the parking lot exit, clipping Pudimott with the car’s side mirror. Fearing for “the safety of themselves, fellow officers, and/or possibly other bystanders,” Mot. to Dismiss and/or for Summ. J. 26, Pudimott and Fischer opened fire, striking Fenwick with four bullets.
After Fenwick recovered from his wounds, he was charged as a juvenile with three counts of felony assault on a police officer — one for each of the deputies on the scene. See D.C.Code § 22-405(c). Pursuant to D.C.Code Section 22-4502, the District also sought a sentence enhancement on each charge “for committing [the] crime when armed.” The enhancement was based not on possession of a pistol or any of the statute’s other enumerated weapons, such as machine guns, rifles, or switchblades, but rather on Fenwick’s operation of the vehicle itself. Following a bench trial in Superior Court, the judge acquitted Fenwick of the charges with respect to Mickle and Fischer, but found that Fenwick committed armed assault on Pudimott when he endangered the officer by accelerating forward while the officer was near the front of the car. The District of Columbia Court of Appeals affirmed the “adjudication” (labeled as such because Fenwick was a juvenile), concluding that “[w]hen operated with the intention to make one’s getaway, and without evident regard for the safety of officers who were trying to persuade the driver to stop, a moving car may well constitute a dangerous weapon capable of causing death or grave injury.” See In re M.T.F., 10 A.3d 1158 (D.C.2010).
Several months later, Fenwick sued the three officers in their individual capacities in the U.S. District Court for the District of Columbia, alleging that their use of deadly force was excessive and thus violated the Fourth Amendment. See Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (establishing damages action against federal officials for violations of constitutional rights). The deputies moved for summary judgment, contending that in light of Fen-wick’s juvenile assault adjudication, his Fourth Amendment claim was barred both by collateral estoppel and Heck v. Humphrey, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that dis *136 trict courts must dismiss damages suits against law enforcement officials that would “necessarily imply the invalidity of [an underlying] conviction”). Mot. to Dismiss and/or for Summ. J. 14. Critically for our purposes, the deputies also asserted qualified immunity. Id. 19-20.
The district court granted summary judgment to Mickle, who never fired his weapon, but denied the motion with respect to Pudimott and Fischer. Beginning with the' deputies’ preclusion arguments, the court explained that under District of Columbia law, “collateral estoppel ‘precludes the relitigation of issues actually litigated and necessary to the outcome of a prior case involving the party against whom estoppel is asserted.’” Fenwick v. United States, 926 F.Supp.2d 201, 210 (D.D.C.2013) (quoting Carr v. Rose, 701 A.2d 1065, 1076 (D.C.1997)). Similarly, the district court observed, Heck v. Humphrey bars Bivens suits “that, if successful, would necessarily imply the invalidity of the plaintiffs conviction or sentence.” Id. at 219 (quoting Taylor v. U.S. Probation Office, 409 F.3d 426, 427 (D.C.Cir.2005)). But recognizing that the excessive force issue was neither litigated nor necessary to the outcome of Fenwick’s assault prosecution, and that a ruling in Fenwick’s favor on his excessive force claim would not “necessarily imply the invalidity” of the assault judgment, the district court determined that the assault judgment did not altogether bar Fenwick’s excessive force claims against Pudimott áñd Fischer. Id. at 216-17, 222. The court explained, however, that collateral estoppel and Heck v. Humphrey did preclude Fenwick from asserting, as alleged in his complaint, (1) that the deputies were never' in any danger of being hit by the vehicle, or (2) that they opened fire before Fenwick began accelerating forward with Pudimott near the front of the car, since findings to the contrary were necessary to Fenwick’s juvenile adjudication. Id at 217-18, 220-22.
As to the officers’ assertion of qualified immunity, the district court determined that genuine issues of material fact — in particular, whether the officers shot Fen-wick while Pudimott was still in danger from Fenwick’s car — precluded summary judgment. Noting that claims of qualified immunity are assessed through the Fourth Amendment’s objective reasonableness lens, the court explained that officers may use deadly force only when a “suspect poses a threat of serious physical harm” to others. Id. at 225-26 (quoting Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In the court’s view, then, the officers’ use of deadly force could be “justified only as a response to the threat Mr. Fenwick posed to Deputy Pudi-mott,” id at 226, and a reasonable jury could find that the deputies shot Fenwick after it had become clear that the danger to Pudimott had passed, id. at 225. “If so,” the district court concluded, “then under the circumstances of this case[,] the deputies violated Mr. Fenwick’s clearly established constitutional rights.” Id. at 225.
On appeal, the deputies challenge the district court’s denial of their motion for summary judgment, renewing their assertion of qualified immunity. See Plumhoff v. Rickard — U.S. -, 134 S.Ct. 2012, 2018-19, 188 L.Ed.2d 1056 (2014) (officers denied qualified immunity on summary-judgment may immediately appeal when the appeal “raise[s] legal issues”). We review de novo the district court’s denial of summary judgment. Arrington v. United States, 473 F.3d 329, 333 (D.C.Cir.2006).
II.
In order to protect officers “from undue interference with their duties and from potentially disabling threats of liability,” qualified immunity shields federal offi *137 cials from damages suits for actions taken while carrying out their official duties. Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To defeat a defense of qualified immunity, a plaintiff must show not only that an official “violated a constitutional right” but also that “the right was clearly established”- at the time of the violation. Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Supreme Court has clarified, however, that courts “have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.” Ashcroft v. al-Kidd, — U.S. — , 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). As the Court has explained, the two-step protocol is ill-suited to certain cases, including those in which the clearly-established-law analysis is cut and dried while the constitutional question presents a close, heavily fact-bound inquiry. See Pearson v. Callahan, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d-565 (2009).
Our concurring colleague would have us decide this case at the first step and hold that, pursuant to Plumhoff v. Rickard, -— U.S. -, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014), the deputies’ actions plainly complied with the Fourth Amendment. In our view, however, the constitutional question is hardly clear, and Plumhoff — a case in which the fleeing suspect led police on a protracted high-speed chase, id. at 2017— has little to say about the quite different situation the deputies faced here. The officers in Plumhoff resorted to deadly force only after the suspect placed in peril the lives of dozens of innocent civilians during his 100 mile-per-hour flight and only after they sought to end the chase through non-lethal means. Id. In this case, by contrast,' although the deputies opened fire after Fenwick clipped Officer Pudimott with the car’s side-view mirror, Fenwick posed no immediate threat to either officers or bystanders at the time of the • shooting. See infra at 138-39; Garner, 471 U.S. at 11, 105 S.Ct, 1694. Given these significant differences between this case and Plumhoff, we think the constitutional question is “far from obvious,” Pearson, 555 U.S. at 237, 129 S.Ct. 808, and that this case is therefore best resolved at the second step. We thus proceed directly to consider whether the deputies’ use of deadly force violated law that was clearly established at the time of the shooting.
“The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U.S. at 202, 121 S.Ct. 2151. Because this inquiry “must be undertaken in light of the specific context of the case, not as a broad general proposition,” id. at 201, 121 S.Ct. 2151, it requires that we take a closer look at the facts. And since the district court decided this case on a motion for summary judgment, we must take the facts and- draw reasonable inferences in the light most favorable ’to the party opposing summary judgment — here, in the light most favorable to Fenwick. See Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
This case features an “added wrinkle”: a videotape capturing the incident in question. Id. In Scott v. Harris, the Supreme Court instructed that we must “view[ ] the facts in the light depicted by the videotape.” Id. at 381, 127 S.Ct. 1769. But in contrast to the videotape in Scott, which “quite clearly” portrayed the events at issue, id. at 378, 127 S.Ct. 1769, the surveillance footage here does no such thing. True, it shows that a few pedestrians and vehicles were on the scene in the minutes before the officers opened fire, but it sheds *138 almost no light on the shooting itself. As both the District Court and the D.C. Superior Court observed, the video is blurry and soundless, and the shooting occurs while Fenwick’s vehicle and all of the officers are obscured by the dark shadow of an adjacent building. Fenwick, 926 F.Supp.2d at 226-27 (noting Superior Court’s description of the footage and outlining video evidence in detail). The videotape thus provides no “ready answers to the factual dispute” and does little to affect our analysis. Id. at 227.
But other important wrinkles— namely, the Heck bar and collateral estop-pel — constrain how we view the facts. As the district court explained, the Superior Court Judge, in finding that Fenwick committed felony assault on Pudimott, “necessarily determined that [Fenwick] created ‘a grave risk of causing significant bodily injury’ to Deputy Pudimott when, ‘without justifiable [and] excusable cause,’ he drove the car forward in a manner that put the deputy in danger of being hit.” Id. at 215 (quoting D.C.Code § 22-405(b) & (c)) (internal quotation marks added). Although Fenwick urges us to ignore these “bad facts,” Appellee’s Br. 50, we are bound by Heck v. Humphrey and the Supreme Court’s admonishment that “a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.” Migra v. Warren City School District Board of Education, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); see also supra at 135-36 (explaining requirements of collateral estoppel under D.C. law).
That said, several facts weigh in Fen-wick’s favor, including (1) the deputies’ concession in this court that Pudimott and Fischer fired on Fenwick only after the vehicle struck Pudimott, when Pudimott was no longer in the car’s path, Appellants’ Br. 7, 12, (2) the Superior Court’s findings that Fenwick did nothing to endanger Mickle or Fischer during his flight, see Fenwick, 926 F.Supp.2d at 215 (reproducing Superior Court findings), and (3) the surveillance footage showing no bystanders in the path of Fenwick’s car.
Thus distilled the record reveals, on the one hand, that the deputies confronted a fleeing motorist who posed no immediate threat to either officers or bystanders when they opened fire, and on the other hand, that the deputies had observed pedestrians and vehicles close by in the minutes leading up to the shooting and, just moments before firing, had seen the fleeing suspect “create[ ] a grave risk of causing significant bodily injury to [an] officer.” D.C.Code § 22-405(c). With “the specific context of th[is] case” now in mind, Saucier, 533 U.S. at 201, 121 S.Ct. 2151, we turn to the officers’ claim that their use of deadly force to apprehend Fenwick “to protect one or more of the deputies or members of the general public from harm,” Appellants’ Br. 22, violated no clearly established law.
III.
 To assess the officers’ claim of qualified immunity, “we look to cases from the Supreme Court and this court” and, if neither provides an answer, “to cases from other courts exhibiting a consensus view.” Johnson v. D.C., 528 F.3d 969, 976 (D.C.Cir.2008). We agree with the deputies that our inquiry begins and ends with Supreme Court precedent — in particular, Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).
In Brosseau, three officers sought to catch a suspect wanted on drug charges. After pursuing him on foot for the better part of an hour, one of the officers chased the suspect back to his car, and, pounding *139 on the driver’s window with her handgun, ordered the suspect to stop. When the suspect ignored the order and began to accelerate forward, the officer fired through the rear driver-side window, striking the suspect in the back. The officer later testified that she shot the suspect out of fear for the safety of “other officers on foot” who, she believed, were close by, and for “occupied vehicles” in the suspect’s path, and for anyone else who “might be in the area.” Id. at 197, 125 S.Ct. 596. The suspect survived and later pleaded guilty to the felony of “eluding,” thereby “ad-mitt[ing] that he drove his [vehicle] in a manner indicating ‘a wanton or willful disregard for the lives ... of others.’ ” Id. (quoting Wash. Rev.Code § 46.61.024 (1994)).
Reviewing these facts and relevant precedent, the Supreme Court “expressed] no view” on the Fourth Amendment question, but determined that the officer was entitled to qualified immunity as her actions “fell in the hazy border between excessive and acceptable force.” Id. at 201, 125 S.Ct. 596 (citation omitted). For us to reach a different conclusion about qualified immunity in this case, Fenwick must show either that the deputies’ conduct was “materially different from the conduct in Bros-seau ” or that between the incident in Brosseau and January 2007 — when Fen-wick was shot — there “emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis.” Plumhoff, 134 S.Ct. at 2023 (citations and internal quotation marks omitted).
Fenwick has done neither. He has made no attempt to distinguish Brosseau, and we doubt he could do so in a meaningful way. Although record evidence in both Brosseau and this case reveals a suspect attempting to flee who posed no immediate threat to any officer or bystander when the officers fired, see supra at 136-38; Brosseau, 543 U.S. at 204, 125 S.Ct. 596 (Stevens, J., dissenting) (describing record evidence in more detail than, but consistent with, majority opinion), trial courts in both cases had determined that the suspects were driving in a reckless and dangerous manner, see D.C.Code § 22-405(c); Wash. Rev.Code § 46.61.024 (1994), and the officers in both cases justified their use of deadly force by claiming concern for the safety of other officers and bystanders. Nor has Fenwick shown that Brosseau’s analysis had become obsolete at the time the deputies shot him. In fact, he has failed to point to “any case — let alone a controlling case or a robust consensus of cases — decided between [the events in Brosseau ] and 200[7] that could be said to have clearly established the unconstitutionality of using lethal force” in this situation. Plumhoff, 134 S.Ct. at 2024. For these reasons, unlike the district court, we see no genuine issue of material fact that precludes summary judgment for the deputiés based on qualified immunity. Whether the deputies shot Fenwick while Pudimott was still in danger from Fenwick’s car, or whether they shot him in the seconds after that danger had passed, Brosseau makes clear that the deputies’ use of deadly force violated no law that was clearly established at the time of the shooting.
In reaching this conclusion, we emphasize that nothing in this opinion should be read to suggest that qualified immunity will shield from liability every law enforcement officer in this circuit who fires on a fleeing motorist out of asserted concern for other officers and bystanders. Outside the context of a “dangerous high-speed car chase,” Scott, 550 U.S. at 386, 127 S.Ct. 1769, deadly force, as the Supreme Court made clear in Garner, 471 U.S. at 11, 105 S.Ct. 1694, ordinarily may not be used to apprehend a fleeing suspect who poses no *140 immediate threat to others — -whether or not the suspect is behind the wheel. Here, however, the Superior Court determined that moments before the shooting, Fen-wick’s driving had posed a “grave risk of causing significant bodily injury” to an officer, D.C.Code § 22-405(c), and that conclusion binds us, see supra at 136-87. Because Fenwick operated his car in a way that endangered an officer, in an area recently traversed by pedestrians and other vehicles no less, it was not clearly established that the deputies violated the Fourth Amendment by using deadly force to prevent his flight. Accordingly, we cannot say that Pudimott and Fischer had “fair notice that [their] conduct was unlawful.” Brosseau, 543 U.S. at 198, 125 S.Ct. 596. The deputies are therefore entitled to qualified immunity.
The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

So ordered.