# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 20, 2015                    Decided June 19, 2015

No. 14-7069

BETTY S. FLYTHE, PERSONALLY, AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF TREMAYNE G. FLYTHE,
APPELLANT

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-02021)

———

*Gregory L. Lattimer* argued the cause for appellant.   With
him on the briefs was *Ernest W. McIntosh, Jr.*

*Carl J. Schifferle*, Assistant Attorney General, Office of
the Attorney General for the District of Columbia, argued the
cause for appellees District of Columbia. With him on the brief
were *Eugene A. Adams*, Interim Attorney General for the
District of Columbia, *Todd S. Kim*, Solicitor General, and
*Loren L. AliKhan*, Deputy Solicitor General.

*Robert E. Deso* argued the cause and filed the brief for
appellee Travis Eagan.

Before: TATEL, KAVANAUGH, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this civil action against two police officers and the District of Columbia, appellant Betty S. Flythe alleges that in violation of the Fourth Amendment and D.C. law, each officer assaulted her son and one killed him. Accepting as true the account of the officer who killed appellant's son, the district court found that the officer's actions were objectively reasonable and thus granted summary judgment dismissing all claims against him. The claims against the District and the other officer went to trial, and the jury returned a verdict for Ms. Flythe. For the reasons set forth in this opinion, we affirm the jury's verdict. But because the record reveals genuine issues of material fact with respect to the actions of the officer who fired the fatal shots—thus making himself the only surviving eyewitness to the actual killing—we reverse the district court's grant of summary judgment in his favor.

**I.**

On Christmas Day in 2009, an unknown assailant threw a brick through the window of a liquor store located on Georgia Avenue in Northwest Washington, setting in motion a chain of events that led to the death of Tremayne G. Flythe. The store's owner, Balbir Singh Hundal, reported the vandalism to the District of Columbia Metropolitan Police Department and then called again the next day to report that the same assailant had tossed an empty bottle at a different window. Early in the afternoon of December 26, Officers Angel Vazquez and Travis Eagan arrived at the store and, acting on Hundal's description of the alleged vandal as a "black male wearing a black jacket walking a dog," they set off in separate cars to canvass the neighborhood.

Officer Vazquez soon encountered Tremayne Flythe, an African-American man walking a dog. In his deposition, Vazquez testified that he parked his cruiser, approached Flythe, and informed him that the police were doing an investigation and wanted to ask him a few questions. Angel Vazquez Dep. 25, Feb. 29, 2012. As directed by Vazquez, Flythe tied the dog to a fence and began accompanying the officer to the rear of the cruiser. *Id.* at 24. Vazquez testified that as they approached the cruiser, Flythe's "demeanor started changing" and he "put[] his right hand on his black jacket," prompting the officer to ask "do you have anything on you that I should know[?]" *Id.* at 25, 22. According to Vazquez, Flythe, standing less than a foot away, responded, "yes, I got a knife," "pulled out a knife," and attempted to stab the officer. *Id.* at 44, 41, 22. Vazquez testified that he then "pushed or kicked" Flythe, drew his gun, ordered Flythe to drop the knife, and fired two shots, at which point his gun jammed. *Id.* at 46, 47. After clearing the jam, Vazquez fired two additional shots, both of which missed. *Id*. at 49–50. Flythe then untied the dog and ran away. *Id.* at 50.

Meanwhile, Officer Eagan, accompanied by store owner Hundal, was patrolling the same neighborhood and heard the following over the police radio:

> **OFFICER [VAZQUEZ]**: Eagan. Four hundred block of Kenyon.
> **OFFICER [VAZQUEZ]**: Hey, (inaudible), copy.
> **DISPATCHER**: 3206 (phonetic).
> **OFFICER [VAZQUEZ]**: Drop the knife.
> **OFFICER [VAZQUEZ]**: Shot.
> **OFFICER [VAZQUEZ]**: Drop the knife.
> (Shot fired)
> . . .

4

> **OFFICER [VAZQUEZ]**: Tried to stab me, ma'am. My gun jammed. Get official on this location.

Radio Run Call 3–4, Dec. 26, 2009.

In his deposition, Eagan testified that shortly after hearing the radio broadcast and seeing Officer Vazquez "running in . . . a guard position . . . . [with] his weapon in his hand," he encountered Flythe and ordered him to "get on the ground . . . now[.]" Travis Eagan Dep. 28, 33, Feb. 29, 2012. According to Eagan, instead of obeying that order, Flythe continued running "3 to 4 feet" past him before suddenly turning around, "yell[ing] something loud," and "ma[king] a motion towards his waistband," from which he pulled a knife and "advance[d] towards" the officer. *Id*. at 35, 43, 34. Eagan fired his weapon, striking Flythe in the leg and abdomen. *Id*. at 43. After bleeding for more than twenty minutes on the sidewalk, Flythe was taken to a hospital where he died.

Tremayne Flythe's mother, Betty S. Flythe, brought suit in the United States District Court for the District of Columbia against Officers Vazquez and Eagan pursuant to 42 U.S.C. § 1983, alleging that both officers employed excessive force in violation of the Fourth Amendment. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 700–01 (1978) (section 1983 establishes a private "remedy, to be broadly construed, against all forms of official violation of federally protected rights"). Ms. Flythe also brought common-law assault and battery, wrongful death, and survival claims against both officers and the District of Columbia as their employer. Finally, alleging that the District breached its duty to properly train and supervise the two officers, Ms. Flythe brought a common-law negligent supervision claim against the city.

All defendants—the two officers and the District—moved for summary judgment. Against the excessive force claim, the officers asserted qualified immunity, which protects law enforcement officials "from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted). With respect to Officer Vazquez, the district court ultimately found "a genuine issue of material fact as to whether Mr. Flythe did, in fact, pose a threat of serious physical harm" justifying Officer Vazquez's use of force and thus denied summary judgment. *Flythe v. District of Columbia*, 4 F. Supp. 3d 216, 221 (D.D.C. 2014). This issue of material fact, the district court ruled, also precluded summary judgment for Officer Vazquez on the assault and battery claim "as a reasonable fact-finder could conclude based on the evidence proffered by the plaintiff that Mr. Flythe carried no weapon and did not otherwise threaten Officer Vazquez during their encounter." *Flythe v. District of Columbia*, 994 F. Supp. 2d 50, 74 (D.D.C. 2013).

The district court reached a different conclusion as to Officer Eagan. Given the radio transmission reporting that Flythe had tried to stab Vazquez, and accepting as "fact[]" that "Flythe did not stop [as Eagan ordered], but instead turned around, yelled, [and] reached toward the waistband of his pants which contained a knife," the court found that Eagan "acted as a reasonable officer would have confronted with the same circumstances" and was thus entitled to qualified immunity. *Id.* at 66, 67. Based on the "undisputed" evidence "that Mr. Flythe had a knife that put Officer Eagan and third-party members of the public in imminent peril of death or serious bodily injury," the district court further concluded that Officer Eagan "was privileged to act, and therefore cannot be liable for battery." *Id.* at 74. The district court therefore granted summary judgment dismissing all claims against Eagan.

Regarding the District's alleged negligent supervision, the district court held that Ms. Flythe had failed to "put forth any evidence that the District knew or should have known that Officer Vazquez was particularly dangerous or incompetent." *Id*. at 72. With respect to Officer Eagan, the district court found it irrelevant that supervisors had questioned his fitness for duty two months prior to the shooting and had ultimately fired him after he tested positive for methamphetamines just four days after killing Flythe. "[T]he District's failure to properly supervise Officer Eagan," the court reasoned, "was not a substantial factor in bringing about Mr. Flythe's death because any officer in Officer Eagan's position would likely have shot Mr. Flythe in the circumstances." *Flythe v. District of Columbia*, 19 F. Supp. 3d 311, 318 (D.D.C. 2014). The court therefore granted summary judgment to the District on the negligent supervision claim.

The district court denied summary judgment, however, on the question whether the District was vicariously liable for any assault and battery committed by its officers. "[A]ssess[ing] both officers' encounter with Mr. Flythe as a . . . single transaction," the court concluded that "Officer Eagan acted in reliance on representations by Officer Vazquez in his altercation with Mr. Flythe" and thus "a genuine dispute of material fact [remained] as to whether Mr. Flythe presented a danger throughout the encounter *with both officers*[.]" *Flythe*, 994 F. Supp. 2d at 75, 76.

To sum up, then, only the section 1983 and assault and battery claims against Officer Vazquez, as well as the vicarious assault and battery claim against the District, survived summary judgment and proceeded to trial. In keeping with its dismissal of Ms. Flythe's negligent supervision claim, the district court excluded expert testimony regarding the District's supervision of Officer Eagan. *Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 230 (D.D.C. 2014). And finding

that "evidence regarding Officer Eagan's subjective judgment is not probative on the issue of the objective reasonableness of his actions," the district court refused to permit expert testimony or cross-examination regarding Officer Eagan's methamphetamine use or fitness for duty. *Id.* at 227.

Following a six-day trial, the jury found Officer Vazquez liable for assault and the District vicariously liable for assault and battery committed by both officers. The jury found no liability, however, on the battery and section 1983 claims against Officer Vazquez. Against the District only, the jury awarded Ms. Flythe $187,300 in compensatory damages. But because Tremayne Flythe's final medical bills were paid by Medicaid, the city asked the district court to reduce the damages award by the cost of those bills in order to prevent his mother from "receiv[ing] a windfall." Defs.' Reply to Pl.'s Opp'n to Set-Off Mot. 2, Apr. 24, 2014. Granting the motion, the district court reduced the jury award to $119,253.24.

Ms. Flythe now appeals, arguing that the district court erred in granting summary judgment to Eagan on the section 1983 and assault and battery claims, as well as to the District on the negligent supervision claim. Ms. Flythe also challenges the district court's exclusion of expert testimony and denial of cross-examination regarding Officer Eagan's fitness for duty and drug use, as well as the court's jury instructions and reduction of the damages award.

## II.

We begin with Ms. Flythe's claim that the district court erred in holding Officer Eagan immune from liability for his use of deadly force. In order to protect law enforcement officers from the "sometimes hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotations and citation omitted), qualified immunity shields them "from damages suits for actions taken

while carrying out their official duties," *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015). This shield, however, is not impenetrable, for officers enjoy no protection for violations of clearly established constitutional rights. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) ("An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.").

Here, Ms. Flythe alleges that Officer Eagan killed her son in violation of the Fourth Amendment. Apprehension of a suspect through deadly force, *i.e.*, killing him, qualifies as a Fourth Amendment seizure, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), and is therefore unlawful unless "objectively reasonable in light of the facts and circumstances confronting [the officer]," *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). Ms. Flythe also contends that Eagan's actions amounted to assault and battery in violation of D.C. law, which, like federal law, immunizes officers to the extent their actions are reasonable. *See Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) ("A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary.") (internal quotation marks omitted).

Although deciding deadly force cases typically requires that we "slosh our way through the factbound morass of reasonableness," *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotation marks omitted), here we need consider only one question: What happened when Tremayne Flythe turned to face Officer Eagan? If, as Officer Eagan claims, Flythe attacked him with a knife, then Eagan reasonably responded to an imminent threat. *See id.* at 384 (officers may use deadly force where a suspect "pose[s] an actual and imminent threat to the lives of . . . the officers involved"). But if, as Ms. Flythe

contends, Tremayne obeyed Officer Eagan's command to "stop" and turned around to surrender, then Eagan's actions were patently unreasonable. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). On this question, we may affirm the district court's grant of summary judgment only if, after viewing the facts in the light most favorable to Ms. Flythe and drawing every reasonable inference in her favor, we can say that no rational trier of fact could disbelieve Officer Eagan's account. *See Scott*, 550 U.S. at 378 ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.") (internal quotation marks and alterations omitted).

## A.

An African proverb teaches that only when lions have historians will hunters cease being heroes. Put another way, history is usually written by those who survive to tell the tale, and in this case the only survivor is Officer Eagan. Tremayne Flythe is dead and, although several witnesses observed the two men face each other, none can testify as to exactly what happened between them. Under these circumstances, where "the witness most likely to contradict [the officer's] story—the person [he] shot dead—is unable to testify," courts, as the Ninth Circuit has explained, "may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Instead, courts must "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* Courts "must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.*

Every circuit to have confronted this situation—where the police officer killed the only other witness to the incident—follows this approach. For example, the Seventh Circuit has explained that "[t]he award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). Accordingly, "a court must undertake a fairly critical assessment of the forensic evidence . . . to decide whether the officer's testimony could reasonably be rejected at a trial." *Id.*; *see also Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010); *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006); *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999); *Ludwig v. Anderson*, 54 F.3d 465, 470 n.3 (8th Cir. 1995); *Hegarty v. Somerset County*, 53 F.3d 1367, 1376 n.6 (1st Cir. 1995).

**B.**

In this case, record evidence casting doubt on Officer Eagan's testimony abounds. Indeed, in several significant respects Eagan's testimony conflicts with that of every other witness, as well as the physical evidence.

First, in his deposition, Eagan described his initial encounter with Flythe. "As I exited my vehicle," he testified, "Flythe had gotten there and just as we met, he then proceeded to pass me just a little bit." Eagan Dep. 32, 33. According to Eagan, it was immediately after this that Flythe turned around and attacked him with a knife. *Id.* at 34.

Three individuals who witnessed the first moments of the encounter, however, testified that the incident actually began with Eagan chasing Flythe while firing his weapon. A nearby neighbor, Ursula Edmonds, told police investigators that "as soon as [Eagan's] car pulled up, the police

officer . . . . [i]mmediately jumped out of the car, . . . started running" and "shooting at the young man." Ursula Edmonds Interview 8, 9, Dec. 26, 2009. Another neighbor, Ivan Cloyd, stated that he saw Flythe "running when the officer was shooting at him." Ivan Cloyd Interview 4, Dec. 26, 2009. And store owner Hundal, who was riding in the cruiser with Eagan, testified that the officer exited the car and chased Flythe while shooting and "say[ing,] stop, stop." Balbir Singh Hundal Dep. 77, 66, Oct. 5, 2012.

The testimony of these three witnesses finds support in the physical evidence. Although only *two* bullets struck Flythe, investigators recovered *three* additional bullets that had been fired from Eagan's weapon on the street where Flythe was shot. This is consistent with the testimony of Edmonds, Cloyd, and Hundal, all of whom said that Eagan repeatedly fired at Flythe and missed.

Second, Eagan testified that Flythe, after running "3 to 4 feet" past him, suddenly "jumped through the air and changed his momentum by doing a hop . . . and started coming towards me," causing the officer to begin "running backwards or walking backwards, retreating." Eagan Dep. 35, 34. Two witnesses told a different story. Even with a clear view of Flythe's head and shoulders, store owner Hundal said nothing at all about a mid-air hop or a backwards retreat. Rather, he testified that after Eagan ordered Flythe to "stop," Flythe turned around and "went face to face with Officer Eagan." Hundal Dep. 90, 91. According to Hundal, he heard the fatal shots immediately "[a]t that time." *Id*. at 90. The other witness, Officer Vazquez, said nothing at all about Flythe changing direction. Instead, Vazquez testified that Eagan "exited his car" as "Mr. Flythe was running towards Mr. Eagan." Vazquez Dep. 60. Vazquez "saw [Flythe] motion towards Officer Eagan" and then "heard the two shots." *Id*. at 62. Asked

whether prior to those shots, he "ever [saw] Flythe stop running," Officer Vazquez answered "[n]o, no." *Id.* at 63.

Third, Eagan's testimony about the knife conflicts in critical respects with the testimony of other witnesses. According to Eagan, Flythe raised the knife "with the blade pointing down and the handle up." Eagan Dep. 42; *see also* Eagan Trial Test. 122 ("[Flythe] raised the knife above his head"); *id*. at 114 ("[Flythe] raised it above his head and advanced towards me"). Yet Hundal, who had a clear view of both men's heads and shoulders and who was questioned intensely about what he saw, said nothing at all about Flythe raising a knife. Officer Vazquez also had a clear view—he saw a "motion towards Officer Eagan," Vazquez Dep. 62—but likewise said nothing about Flythe raising a knife. Neighborhood resident Demetrius Moore, who observed the scene immediately after the shooting, testified that despite "looking[] and trying to see all [she] could see," she saw no knife near Flythe as he lay wounded on the ground. Demetrius Moore Dep. 16, Apr. 2, 2012. True, the police ultimately recovered a knife "six inches or a foot away from [Flythe's] foot," Warren E. Jones Dep. 27, Mar. 23, 2012, but Flythe's fingerprints were never found on the knife, Raymond E. Bond Dep. 48, Mar. 21, 2012. And for unknown reasons, the police chose not to test the knife for Flythe's DNA despite having swabbed it for precisely that purpose. *Id*. at 48–49.

Moreover, and further undermining Eagan's claim that Flythe had a knife, all five witnesses to Officer Vazquez's confrontation with Flythe testified that Flythe had no knife at that time. Despite Officer Vazquez's command, heard on the radio transmission, to "drop the knife," all five witnesses unequivocally stated that Flythe's hands were empty. In fact, three of the witnesses saw Flythe with his hands raised, palms forward. Moreover, a passing driver, the witness most supportive of Officer Vazquez's account, testified that

although Flythe was "aggressive" and "rush[ed] towards [Vazquez]," she "specifically saw [Flythe's] hands as he advanced at the police officer and did not see a weapon in his hands." Sabrina Shapiro Dep. 33, 7, 32, Apr. 2, 2012.

Finally, the record contains evidence that could lead a reasonable juror to question Officer Eagan's personal credibility and his ability to observe, perceive, and recall the shooting. Two months prior to the shooting, Eagan's supervisor, Lieutenant Madeline Timberlake, "noticed a change in his work performance as well as his demeanor." Madeline Timberlake Mem., Oct. 15, 2009. Eagan told Lieutenant Timberlake that "he had a sleeping disorder" for which his doctor had prescribed "strong[] medication." *Id.* Believing "that Officer Eagan should be evaluated mentally as well as physically to determine if he [was] capable of performing his duties," Lieutenant Timberlake revoked his police powers and relieved him of his firearm pending a fitness-for-duty examination. *Id.*; *see also* Notice of Duty & Pay Status 1, Oct. 15, 2009. But just two weeks later, and without having undergone any examination, Eagan's police powers were inexplicably restored and his gun returned. Notice of Duty & Pay Status 1. Moreover, four days after killing Tremayne Flythe, Eagan tested positive for methamphetamines. Although claiming medication prescribed by a doctor caused the positive test, Eagan "could not provide any specific information on the dose, when he took it, and he could not provide any evidence of it being given to him (no prescription, no doctor record, no verbal confirmation from a doctor, etc.)." Myron Weiner Expert Rep. 2, Oct. 19, 2012. The District argues that the positive test is irrelevant because it occurred four days after the killing, but in his deposition, Eagan agreed that whatever substance he "took before [the] drug test on December 30, 2009 is the same thing [he] took before [he] shot Tremayne Flythe on December 26, 2009."

Eagan Dep. 65. Indeed, the police department fired him after concluding that he lied about using illegal methamphetamines.

The district court dismissed all of this evidence, finding that "whether or not Mr. Flythe actually brandished a knife against Officer Eagan is largely irrelevant" because given the radio transmission indicating that Flythe attempted to stab Officer Vazquez, "it was objectively reasonable for Officer Eagan to believe that Mr. Flythe had a knife and was dangerous—whether or not he actually ever saw the knife himself (or whether or not the knife found near Mr. Flythe's body actually belonged to him)." *Flythe*, 994 F. Supp. 2d at 68. We disagree. That an individual at one point posed a threat does not grant officers an irrevocable license to kill. Justification for deadly force exists only for the life of the threat. As the Supreme Court has explained, "police officers are justified in firing at a suspect in order to end a severe threat to public safety . . . *until* the threat has ended." *Plumhoff*, 134 S. Ct. at 2022 (emphasis added). Here, the threat to Vazquez had ended by the time Eagan confronted Flythe, and Eagan never claimed that he viewed Flythe as an immediate threat. Quite to the contrary, Eagan testified that his first instinct upon encountering Flythe was "to holster [his] weapon" and "engage[] in a foot pursuit[.]" Eagan Dep. 33.

Accordingly, whether Eagan acted reasonably *does* turn on whether, as he alleges, Flythe attacked him with a knife. And given all of the evidence discussed above—the inconsistencies between Eagan's testimony and the testimony of other witnesses, the physical evidence, and the evidence raising questions about Eagan's personal credibility—and drawing all inferences in Ms. Flythe's favor, we believe that a reasonable jury could conclude that Tremayne Flythe never threatened Officer Eagan with a knife. True, a jury could also conclude that he did, but "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We shall therefore reverse the district court's grant of summary judgment to Officer Eagan.

## III.

We can easily resolve Ms. Flythe's remaining arguments. Although the jury returned a verdict in her favor in the trial against Officer Vazquez and the city, and awarded her compensatory damages, Ms. Flythe seeks a new trial on two grounds.

First, Ms. Flythe contends that the district court erroneously excluded expert testimony and precluded cross-examination regarding Officer Eagan's credibility. As indicated above, we agree that the district court erred when it found Eagan's sleep disorder and drug use insufficient to place his "ability to perceive or recall facts . . . legitimately at issue" and irrelevant to the "question . . . whether both officers are lying." *Flythe*, 4 F. Supp. 3d at 227, 229. In order to set aside the jury's verdict on this ground, however, Ms. Flythe "must explain why the erroneous ruling caused harm." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009). And having obtained a favorable verdict despite the district court's errors, Ms. Flythe suffered no harm with respect to the jury's liability finding, and she never argued that the error affected the jury's calculation of compensatory damages.

Second, Ms. Flythe challenges the district court's jury instructions on the grounds that they were confusing and misleading. But Ms. Flythe has forfeited this claim because she has never—neither here nor in the district court—identified any specific legal error in the instructions. *See Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, objections to a charge must be

sufficiently specific to bring into focus the precise nature of the alleged error.").

Ms. Flythe also argues that the district court should never even have instructed the jury on whether Officer Vazquez's encounter with Tremayne Flythe constituted a Fourth Amendment seizure. Such "a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority," *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014), and Ms. Flythe argues that "it is undisputed" that this occurred in this case, Pl.'s Br. 48. But the district court disagreed, finding that "there is a genuine issue of fact as to whether Mr. Flythe momentarily submitted to Officer Vazquez's show of authority," *Flythe*, 4 F. Supp. 3d at 220, a ruling Ms. Flythe failed to appeal. We therefore find no error in the district court's submission of this factual question and concomitant instructions to the jury.

In addition to challenging the jury's verdict, Ms. Flythe argues that the district court erroneously granted summary judgment to the District on her negligent supervision claim. But she has failed to show how compensatory damages—the only type of damages recoverable against the District, *see Smith v. District of Columbia*, 336 A.2d 831, 832 (D.C. 1975) ("[A]s a general rule there can be no recovery of punitive damages against a municipality absent a statute expressly authorizing it. There is no such statute in [the District of Columbia]")—would differ had this theory of liability been submitted to the jury. Unlike punitive damages, which are intended to "punish the wrongdoer," *Brown v. Coates*, 253 F.2d 36, 40 (D.C. Cir. 1958), compensatory damages are assessed only to "make plaintiffs whole for the harms that they have suffered as a result of defendants' actions," *Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996). Here, the jury valued Tremayne Flythe's harm at $187,300, and "in the absence of punitive damages a plaintiff can recover no more

than the loss actually suffered," *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) (internal quotation marks and citation omitted). In other words, Flythe's harm—his pain and suffering, mental anguish, and emotional distress—cannot be increased just because there is more than one theory under which the District is liable for his death. Thus, even if the district court should have permitted presentation of the negligent supervision claim to the jury, along with the vicarious assault and battery claim, its failure to do so was harmless because Ms. Flythe "cannot recover the same [compensatory] damages twice, even though the recovery is based on two different theories." *Id.* And although Ms. Flythe now argues that the jury's compensatory damages award is inadequate and nonsensical, she forfeited that claim by failing to raise it in the district court. *Ryen v. Owens*, 446 F.2d 1333, 1334 (D.C. Cir. 1971) ("[A] motion for a new trial must be made to the trial court if a party desires to attack on appeal a judgment in a jury case on the ground that the damages are inadequate.").

Finally, Ms. Flythe challenges the district court's deduction of Tremayne Flythe's medical costs from the jury's damages award. But D.C. law provides that "whenever the District is a defendant in a proceeding brought by a beneficiary, it shall have a right to set off from a judgment against it any damages that represent compensation for the care and treatment it has undertaken to provide or pay for as health-care assistance." D.C. Code § 4-603(a). Once the jury determines "the amount of full, just compensation," the trial court must "thereafter adjust the verdict by the amount of any applicable setoff." *Reid v. District of Columbia*, 391 A.2d 776, 778 (D.C. 1978). In this case, the district court admitted the bill for Tremayne Flythe's final medical expenses into evidence, and it is undisputed that the city paid that bill through Medicaid. It was thus entitled to a setoff.

**IV.**

For the foregoing reasons, we reverse the district court's grant of summary judgment on the section 1983 and assault and battery claims against Travis Eagan and remand for further proceedings consistent with this opinion. In all other respects, we affirm.

*So ordered.*