[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14691
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cv-03155-WFJ-SPF


TRESA BROWN,
as Personal Representative of the Estate of Jerry Dwight Brown,
and on behalf of herself as a survivor and on behalf of Survivors,
Sons 1 and 2,

Plaintiff-Appellee,

versus

CHRIS NOCCO,
in his capacity as Sheriff of Pasco County, Florida,
DANIEL LESLIE GREEN, individually,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 2, 2019)

Before WILLIAM PRYOR, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

This case arises from the fatal shooting of Jerry Dwight Brown during a buy-bust operation in Pasco County, Florida.  Pasco County Sheriff Chris Nocco and Detective Daniel Leslie Green appeal from a district court order denying their motion for summary judgment on two claims brought by the personal representative of Brown's estate (the "Estate"): an excessive force claim under 42 U.S.C. § 1983 against Green, to which Green raised a defense of qualified immunity, and a state-law wrongful death claim against Nocco in his official capacity.  Viewing the evidence in the light most favorable to the Estate, a jury could find that Green's use of deadly force against Brown was excessive and violated Brown's clearly established Fourth Amendment rights.  We therefore affirm the denial of qualified immunity as to Green.  And because the wrongful death claim is not inextricably intertwined with or necessary to ensure meaningful review of the qualified immunity issue, we decline to exercise pendent appellate jurisdiction over that claim and dismiss the appeal in part.

## I.

On three occasions in 2014, Adam Tellier, an undercover detective with the Pasco County Sheriff's Office ("PCSO"), purchased opioids from Brown—from 5 to approximately 70 pills at a time.  The drug buys occurred at or near the tire shop

where Brown worked.  There is no indication in Tellier's incident reports that Brown displayed aggression or was armed during these transactions.  Another officer testified that Brown had not displayed aggression during prior undercover operations, and Brown had previously been arrested at the tire shop for possession of a controlled substance "without incident."  Further, although Brown's criminal history included an arrest for armed robbery and kidnapping, that arrest occurred more than 15 years earlier.

Tellier and other PCSO officers devised a plan to conduct an undercover buy-bust operation in which Tellier arranged to purchase 90 Dilaudid pills from Brown at the tire shop.  The transaction was to take place inside an undercover police vehicle driven by Tellier.  Upon a verbal and visual cue from Tellier, the "takedown" team was to move in and arrest Brown.

During a briefing on the day of the bust, Tellier informed the other officers that Brown could be armed and dangerous, and various roles were assigned to the members of the takedown team.  Sergeant Clinton Cabbage was chosen to serve as the "point man" at the front windshield, where he would train his gun on Brown and command him to put his hands up.  Detective Lawrence Caruso was to hold a ballistic shield at the passenger door and give additional commands.  Once it was safe to allow for extraction, Caruso was to open the door, and Green was to pull

Brown to the ground and take him into custody.  After the briefing, the team practiced the takedown several times.

Later that afternoon, Tellier arrived at the tire shop in his undercover vehicle, equipped with a body camera to record audio and video of the drug buy. After some negotiation as to exactly where on site the transaction would take place, Brown reluctantly entered the vehicle and sat down in the passenger seat. Tellier took out the buy money and Brown withdrew a clear bag of pills from his right pocket and showed them to Tellier.  Tellier gave the verbal cue and Brown put the pills back into his pocket.

The takedown team approached the undercover vehicle wearing tactical vests marked "sheriff."  Caruso, carrying a ballistic shield also marked "sheriff," stood at the passenger door window, and Green took a position behind him and to his left, near the seam between the front and rear passenger doors.  Cabbage stood next to the right front fender, pointed his firearm at Brown through the windshield, and shouted at him to show his hands.[1]  Brown tried to push open the passenger door, but Caruso forced it shut almost immediately.  After trying to get out, Brown reached toward his right pocket with both hands and leaned his body toward the

---

[1] Although the takedown plan called for Cabbage alone to give the initial instructions to Brown, it appears that several officers began shouting at Brown at once.  All that can be heard on the audio from Tellier's body camera inside the vehicle is unintelligible shouting and one partial command to "put your f***ing ha--" before the first shot was fired.

4

driver's side.  Cabbage fired three shots in quick succession at Brown through the windshield, striking him in the abdomen and in the right buttock.[2]

Tellier exited the vehicle as the first two shots were fired.  From outside the driver's-side door, Tellier's body camera recorded Brown yelling, wailing, and flailing toward the back of the vehicle over the center console, with his right arm in the air and his right hand visible for a split second.  His torso was not clearly visible from Tellier's vantage point at the time, but given the position of Brown's arm, he appeared to be facing away from Cabbage and Green leaning over the center console toward the back seat.  This is consistent with the PCSO bullet trajectory analysis, which indicated that Brown was turned significantly to his left, facing away from Cabbage and canted so that his right buttock was elevated when Cabbage's bullet struck it.

Cabbage testified that after he fired his third shot, Brown was still not complying with commands to show his hands, but was "inactiv[e]."  At that point, Cabbage believed that the "threat was stopped," so he stopped firing.

At about that time, Caruso, who was to open the passenger door as soon as it was safe to allow for extraction, opened the passenger door to give Green that option.  Several seconds later, Green—who had unholstered his weapon and

---

[2] Though the Estate previously named Cabbage as a defendant, it is no longer pursuing an excessive force claim against him.

5

moved forward to within a few feet of Brown—shot Brown through the open passenger door.  Tellier's body-camera video does not show what Brown was doing at the time.  Green testified that Brown was still arched back in the passenger seat, leaning to his left toward the center console but with his entire right side visible to Green.  Green testified that he saw Brown take his right hand out of his right pocket and then put it back in, and that there was a bulge in Brown's pocket that Green believed might be a weapon.  Just before shooting, Green started to order Brown to show his hands, but he did not complete the command before discharging his weapon.

Green's bullet entered Brown's mid-back to the left of his spine and traveled upward and to the right through his body, lacerating his spinal cord, perforating the lower lobe of his right lung, and lodging in his right chest muscle.  According to the Estate's medical expert, given Green's position when he fired—standing and pointing his weapon down at Brown—the path of the bullet indicated that when he was shot Brown was face down "in a prone position relative to the shooter, facing away from the direction of fire."

Brown died of multiple gunshot wounds, and Green's shot to the back contributed to his death.  After the shooting, police discovered that Brown was unarmed.

6

II.

Following removal from state court, the Estate filed a third amended complaint against Nocco and Green, alleging an excessive force claim against Green under 42 U.S.C. § 1983 and a Florida wrongful death claim against Nocco in his official capacity.  Green and Nocco moved for summary judgment on both counts, raising a defense of qualified immunity to the excessive force claim.  The district court denied the motion.  For Green's qualified immunity defense, the court concluded that because parts of Green's testimony were contradicted by other evidence, including the body-cam video and forensic evidence, a jury could discount his testimony and find that Green had shot Brown in the back when he was not "a threat to safety or flight," in violation of Brown's clearly established constitutional rights.  The court also denied Nocco's motion for summary judgment on the wrongful death claim as a matter of state law.  This interlocutory appeal followed.

III.

We review the denial of summary judgment on qualified immunity grounds de novo, "applying the same legal standards that governed the district court." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In evaluating a motion for summary judgment, a court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano*, 707 F.3d at 1247 (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)). By considering the record in this light in a qualified immunity case, the court "eliminates all issues of fact" and "has the plaintiff's best case before it." *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005). On interlocutory appeal from the denial of summary judgment on qualified immunity grounds, we "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016).

## IV.

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, a defendant must first prove that he was acting within the scope of his discretionary authority

8

when the relevant conduct took place. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, the parties do not dispute that Green was acting within the scope of his discretionary authority as a Pasco County Sheriff's deputy when the alleged constitutional violation occurred during the buy-bust operation.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." *Id.* In evaluating whether a plaintiff has met this burden, we examine: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right, and (2) whether the right in question was clearly established. *Id.*

A.

"Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (per curiam) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "That standard asks whether the force applied 'is objectively reasonable in light of the facts confronting the officer,' a determination we make 'from the perspective of a reasonable officer on the scene' and not 'with the 20/20 vision of hindsight.'" *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam) (quoting *Crenshaw v. Lister*, 556 F.3d 1283,

9

1290 (11th Cir. 2009) (per curiam)).  We recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.

In assessing reasonableness, we look to the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  Deadly force may be permissible where an officer: "'(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible."  *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (emphasis in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)).  An officer is not required to wait until a suspect uses a weapon before applying deadly force, though the reasonableness of the force under such circumstances is inherently fact specific.  *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010).

Using the Estate's version of the facts, as we must at this stage, Green's use of deadly force against Brown was excessive. Brown's crime, though serious, was nonviolent, and there was no evidence that Brown was armed or behaving aggressively. According to the Estate, Brown was turned away from Green and the other officers—seriously wounded and lying prone on his stomach across the center console—when Green shot him in the back. Cabbage had stopped firing because he believed that Brown no longer posed any threat, and Caruso, who had planned to open the passenger door only when it was safe to extract Brown, had done so. Although Green started to instruct Brown to put his hands up, the audio from Tellier's body camera indicates that Brown was given no time to comply before Green shot him.

Green argues that the district court erred in not crediting his testimony that from his perspective, Brown did not comply with multiple commands and had his hand in his pocket at the moment that Green fired. But we cannot credit an officer's version of events just because a plaintiff cannot personally rebut it. *See Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019). Instead, we must review the record and consider "whether the officer's story is internally consistent and consistent with other known facts." *Id.* (quoting *Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015)). "Where circumstantial or other evidence, if believed, 'would tend to discredit the police officer's story,' or where such

11

evidence 'could convince a rational factfinder that the officer acted unreasonably,' we do not simply accept the officer's account." *Id.* (quoting *Flythe*, 791 F.3d at 19).

Here, several inconsistencies between Green's testimony and other evidence "tend to discredit" Green's story. Green testified on the day of the shooting that he shot Brown in the chest, but he actually shot Brown in the middle of his back. Green testified that Brown was arched back in his seat with his right profile visible to Green from where Green stood a few feet from the passenger door, but the bullet's trajectory (as interpreted by the Estate's expert) showed that Brown was turned completely away from Green, in a prone position. Green testified that Brown was "just kind of yelling in general" before any shooting began, but the incident audio showed that Brown was quiet before Cabbage fired the first shot. Green testified that Brown had opened the door through which Green fired, but the video and Caruso's testimony indicate that Caruso—not Brown—opened the door before Green fired.

Because Green's testimony conflicts with other evidence on key points, the jury may or may not believe his version of the facts. Under the circumstances shown by the remaining evidence, viewed in the light most favorable to the Estate, "a reasonable jury could find [Green's] use of force 'unnecessary and disproportionate,' and thus excessive." *Perez v. Suszczynski*, 809 F.3d 1213, 1219

12

(11th Cir. 2016) (quoting *Lee*, 284 F.3d at 1198).  In other words, under the Estate's version of the facts, Green's conduct—shooting Brown in the back as he lay prone, face down, and unresisting—was objectively unreasonable and violated Brown's Fourth Amendment right to be free from the use of excessive force.

B.

Having found the violation of a constitutional right, we turn to the question of whether that right was clearly established at the time of the violation.  "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The "salient question" is whether the state of the law at the time of an incident gave officers "fair warning" that their actions were unconstitutional.  *Id.* at 741.  There are three ways in which a plaintiff can demonstrate that a constitutional right was clearly established: (1) by producing "a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state"; (2) by pointing to a "broader, clearly established principle [that] should control the novel facts in [his] situation"; or (3) by showing that "an official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point."  *Morton v. Kirkwood*, 707 F.3d 1276,

13

1282 (11th Cir. 2013) (alterations in original) (citations and internal quotation marks omitted).  We look only to binding precedent to determine whether a constitutional right was clearly established at the time that it was violated.  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

While there need not be a case "'directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).  For a broad principle to clearly establish the law, it must apply "'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (citation omitted).

Both Supreme Court precedent and our precedent broadly establish that the use of deadly force is not justified where a suspect "poses no immediate threat to the officer and no threat to others."  *Garner*, 471 U.S. at 11; *accord Perez*, 809 F.3d at 1222; *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1483–84 (11th Cir. 1985).  And more than 25 years before the shooting here, we held that "shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was—even in July, 1983—an unreasonable seizure and clearly violated

14

fourth amendment law." *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987). In *Lundgren*, we affirmed the denial of qualified immunity for officers who shot and killed a suspect who may have been holding a gun, where the parties presented conflicting evidence as to whether the suspect fired at the officers or threatened them with the gun before they shot him. *Id. Garner*, *Lundgren*, and other precedents decided before the 2014 shooting here "gave fair warning that the use of deadly force against a non-resisting suspect who posed no danger violates a suspect's Fourth Amendment right to be free from excessive force." *Morton*, 707 F.3d at 1283 (citing *Vaughan*, 343 F.3d at 1332).

The district court correctly concluded that a reasonable jury could find that Green shot Brown in the back while he lay face down and prone across the center console, turned away from the officers and posing no threat to anyone, and that doing so violated a clearly established constitutional right. While Green may yet succeed on a qualified immunity defense at trial if the fact-finder accepts his version of events, he is not entitled to that immunity at this stage of the litigation. *See Perez*, 809 F.3d at 1218; *Vaughan*, 343 F.3d at 1333.

## V.

"An appeal from the denial of qualified immunity may implicate this Court's discretionary pendent appellate jurisdiction to review otherwise non-appealable matters." *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016). Under the

15

doctrine of pendent appellate jurisdiction, we may exercise jurisdiction over a non-appealable decision if it is "'inextricably intertwined' with an appealable decision or if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999) (alteration in original) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995)). "Issues are not 'inextricably intertwined' with the question on appeal when 'the appealable issue can be resolved without reaching the merits of the nonappealable issues.'" *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) (quoting *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1179 (11th Cir. 2011) (per curiam)).

Here, review of the state wrongful death claim would require us to examine whether the claim sounds in negligence, and if it does, whether Brown was owed a duty of care and whether Nocco was entitled to sovereign immunity under Florida law.[3] Because these issues are neither inextricably intertwined with nor necessary to ensure meaningful review of the qualified immunity issue, we decline to exercise jurisdiction over the wrongful death claim and dismiss the appeal in part.

---

[3] To the extent that appellants seek review of the denial of sovereign immunity on the wrongful death claim, that aspect of the order is not immediately appealable under the collateral order doctrine because Florida sovereign immunity provides "only a defense to liability, rather than immunity from suit." *Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1368 (11th Cir. 2016).

VI.

For the reasons stated above, the district court's denial of qualified immunity as to Green is AFFIRMED. To the extent that appellants challenge the denial of summary judgment on the wrongful death claim, the appeal is DISMISSED IN PART.