[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
————————————————

No. 16-14112
————————————————

D.C. Docket No. 3:14-cv-02127-HLA-MCR


MATTHEW REID HINSON,

Plaintiff-Appellee,

versus

R.A. BIAS, Officer #61580,
B.K. KREMLER, Officer #64398,
S.T. WILLIAMS, Officer #64402,
Z.M. ANDERSON, Officer # 67377,
ROB SCHOONOVER, Officer #6434,

Defendants-Appellants.


————————————————

Appeal from the United States District Court
for the Middle District of Florida
————————————————

(June 14, 2019)

Before JORDAN, ROSENBAUM, and DUBINA, Circuit Judges.

ROSENBAUM, Circuit Judge:

For no apparent reason, Plaintiff-Appellee Matthew Hinson stabbed a man he did not know in the neck during a chance encounter at a pub. As the man laid on the ground bleeding to death, Hinson calmly walked to the parking garage, got into his truck, and began to leave. But at the garage's checkout booth, Defendants-Appellants Jacksonville Sheriff's Office Officers caught up with him.

In this 28 U.S.C. § 1983 action, Hinson alleges that the Officers violated his Fourth Amendment rights by employing excessive force in effecting his arrest. He also asserts that the Officers transgressed his Eighth Amendment rights by being deliberately indifferent to medical needs he purportedly experienced as a result of the force inflicted during the arrest.

In support of his claims, Hinson relies on surveillance footage of the parking area, as well as his father's sworn interpretation of that same surveillance recording. For their part, the Officers deny that they used excessive force, and they support their version of the facts with their sworn statements recounting what happened during the arrest. In an interesting twist, they also rely on the same video recording as Hinson, in addition to Hinson's medical records.

But what looked at first like a tale of two stories turns out to be but a single one, uncontradicted in any material way by any admissible evidence in this case. And under that single rendition of the facts, the Officers here did not use excessive force to effect Hinson's arrest. Nor were they deliberately indifferent to Hinson's

2

medical needs.  For these reasons, the Officers are entitled to qualified immunity, and we vacate the district court's contrary conclusion.

## I.  Facts

A.  The Stabbing

Though the day ended tragically, October 6, 2012, started out usually enough for Plaintiff-Appellee Matthew Hinson.  He completed his shift as a cook at the Hyatt Regency in downtown Jacksonville at around 6:00 or 7:00 p.m.  Then he went home, where his wife was, and watched the end of a football game.  After that, Hinson went for a few hours to his friend's house down the road, where he had several beers. While he was there, Hinson's wife, who had since gone to Fionn MacCool's Irish Pub and Restaurant at the Jacksonville Landing, started calling and texting him to pick her up.

Hinson eventually left his friend's home and went over to Fionn MacCool's. But when he arrived at the restaurant, his wife was not yet ready to leave.  So Hinson took a seat at the bar and had another beer or two.

At some point, Hinson encountered Chris Pettry, a man he had never previously met, in the restaurant.  The trigger, if any, for what occurred next is unclear:  Hinson grabbed his pocket knife, stabbed Pettry in the neck, and inflicted a four-inch laceration wound on one side of Pettry's throat.  Pettry died soon after, as a result of this wound.

3

## B.  The Arrest

After stabbing Pettry, Hinson left Fionn MacCool's and headed for the parking garage.  At the garage, Hinson got into his truck and drove to the checkout booth, where officers arrested him.  Hinson testified that he remembered nothing at all about his arrest after he put his hands up in response to officers' commands.  So the sources of evidence concerning what happened during the arrest consist solely of the participating officers' statements and video surveillance footage.[1]  We review them below.

### 1.  The Officers' Statements

Defendants-Appellants Jacksonville Sheriff's Office ("JSO") Detective Z.M. Anderson and Officer B.K. Kremler responded to the scene after learning of the life-threatening stabbing.  At the time, they knew of the suspect's description and whereabouts from a witness.  Anderson and Kremler caught up with the suspect, who turned out to be Hinson, at the parking garage around midnight, as Hinson sat in his truck and tried to pay for his parking.  According to Anderson, when he and Kremler approached Hinson's truck with their guns drawn, the engine was still on.

---

[1] James Hinson, Hinson's father, also provided an affidavit concerning the events of the arrest.  But his statement was based solely on his interpretation of the video surveillance footage. As this evidence constitutes inadmissible hearsay, and the video footage itself provides the best evidence of what is on the video footage, we do not consider James Hinson's affidavit.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Anderson saw Hinson, sitting in the truck. And he noted that Hinson matched the description of the suspect the officers had received.

Anderson and Kremler attested that Kremler instructed Hinson to put his hands up where the officers could see them. But, the officers stated, Hinson did not comply. So Kremler continued to tell Hinson to put his hands up. Eventually, Hinson raised his left hand, but Kremler was unable to see Hinson's other hand. Finally, the officers reported, Hinson put both hands up.

While this was occurring, two more JSO officers arrived on the scene in response to a radio dispatch about the life-threatening stabbing. Defendant-Appellant Officer S.T. Williams first went to Fionn MacCool's, where he saw the victim lying in a pool of his own blood, apparently dead. Then Williams learned that Anderson and Kremler had found Hinson. So he went to the parking garage to see if he could be of assistance.

There, Williams met up with Defendant-Appellant Officer R.A. Bias, who had arrived at the garage and had run to the driver's door of Hinson's truck. Bias, too, drew his gun and pointed it at Hinson. He then commanded Hinson to keep his hands up and get out of the truck, facing away from Bias (for officer safety). Hinson did not respond, so Bias continued instructing Hinson to leave the truck. At some point, Bias opened the truck's door, and after some time passed, Hinson finally put one leg on the ground. Bias took Hinson's hand and extracted him from the truck.

5

As Bias and Hinson left the confined area between the truck and the checkout booth, Bias told Hinson to turn around and face away from him, so Bias could handcuff Hinson. Instead, Hinson continued moving towards Bias. Again, Bias commanded Hinson to stop and turn around. But Hinson again did not comply.

Anderson, who could see this occurring, attested that he then became concerned for Bias's safety, since Bias no longer had his weapon drawn, Bias was significantly smaller in stature than Hinson, and the officers had no way of knowing whether Hinson was armed. So Anderson grabbed Hinson's wrist and shoulder and performed a police maneuver known as a "straight arm bar takedown." As a result, Hinson was in a prone position on the ground, next to the checkout booth.

Once Hinson was down, Bias stated, Bias attempted to handcuff him. Towards this end, Bias repeatedly instructed Hinson, whose hands were under him, to release his hands. But according to the officers, Hinson would not cooperate. Instead, Hinson struggled to keep his hands underneath his body.

Bias started to become concerned that Hinson might be trying to reach a weapon while his hands were under his body. So to induce compliance with Bias's directive to Hinson to produce his hands for handcuffing, Bias made "five or six hammer strikes"[2] to Hinson's upper-mid back area. In addition, Anderson gave one

---

[2] According to Bias, a hammer strike is a JSO-sanctioned striking technique used "to distract, incapacitate, or gain control of a subject who is on the ground and physically resisting police efforts to secure his hands and/or refusing to comply with lawful police commands such as

6

"pain compliance strike to Hinson's face" to obtain Hinson's cooperation. Hinson then released his hands from underneath his body, and Bias handcuffed him.

The officers who viewed the arrest stated that once Hinson was handcuffed, no officer used further force against him, and all the officers denied using or seeing any other officer use a flashlight to administer the strikes or otherwise to hit Hinson. Nevertheless, Anderson, Bias, and Williams conceded that Hinson sustained abrasions to the skin on his left cheek, eye, and forehead, from the pavement, as a result of the officers' arrest efforts.

After Hinson was handcuffed, JSO Sergeant William Janes arrived on the scene. Janes attempted to get Hinson to stand, so he could place Hinson in his patrol car. According to Janes, however, Hinson refused to comply. Instead, Hinson fell to the ground. So Janes picked up Hinson, and Hinson then walked to Janes's patrol car on his own. Kremler and Williams attested that they saw these events, and while they were occurring, Hinson never lost consciousness. Along with Anderson, Bias, and Janes, Kremler and Williams also insisted that Hinson never requested medical attention and that they never perceived him as requiring it.

---

'put your hands behind your back.'" Bias explained that JSO officers are trained to stop applying striking techniques once the subject is secured or ceases resisting. Bias further asserted that such striking techniques are "in line with generally-recognized and accepted police practice in the United States and the State of Florida."

7

After officers secured Hinson in the patrol car, they found a large knife wedged between the driver's seat and the console inside Hinson's truck. Another knife laid on the ground by the driver's door. JSO later determined that the knife found on the ground next to the truck was the knife used to cut Pettry's throat earlier that evening.

Janes drove Hinson to the Police Memorial Building, where Janes turned Hinson over to homicide detectives. At no point during the arrest was Defendant-Appellant JSO Lieutenant Rob Schoonover present.

### 2. The Video Recordings

The surveillance video taken at the checkout booth does not include audio. But to the extent that its limited view allows,[3] the video is, for the most part, not inconsistent with the officers' description of what occurred during the arrest.

It shows that while Hinson was at the checkout booth, Officers approached his truck with guns drawn and pointed them at Hinson in his truck. Roughly seven seconds later—enough time for officers to repeatedly instruct Hinson to put his hands up—Hinson put his left hand up and outside his truck's window.

---

[3] For purposes of viewing the extraction of Hinson from his truck, perhaps the most useful angle of the surveillance video captured a bird's eye view of a portion of the driver's side of Hinson's truck and the edge of the checkout booth. The angle shows the officers' drawn guns in the opening between the truck and the checkout booth, but the view inside the truck is extremely limited because the video was positioned over the top of the truck's roof, so only a few inches of space inside the vehicle are visible. Because the surveillance system was equipped with a motion sensor that regulated when video was recorded, the surveillance video is not continuous and uninterrupted from every angle throughout the arrest.

8

At that time, Hinson dropped out the window what later turned out to be a knife. None of the Officers reported seeing Hinson drop the knife out the window. Anderson, however, attested that he saw a knife fall from Hinson's lap to the ground, when Hinson left the truck. Since only one knife was recovered from the ground, the knife Anderson purported to see fall from Hinson's lap must have been the knife that Hinson actually dropped out the window. This is the one inconsistency between the video footage and the Officers' testimony that our review of the evidence reveals. As we discuss later, though, it does not concern a matter that is material to the granting of summary judgment here.

After Hinson dropped the knife out the window of his truck, he held his left hand up for about twelve seconds before reaching that hand back into the truck and out of the Officers' views. A couple of seconds later, Hinson again put his left hand outside the driver's window of his truck. Seven seconds after that, Hinson put both hands up and outside the driver's window. Again, these intervals would have permitted sufficient time for the Officers to have repeatedly instructed Hinson to put his hands up.

Roughly another thirty seconds passed before an officer opened the truck's door. This period also was more than enough time for Officers to have repeatedly instructed Hinson to leave the truck. Then another eight seconds went by, and Hinson put one foot outside the truck. After seven more seconds, an officer took

9

Hinson's arm and pulled him from the truck. During the next several seconds, Hinson moved back in the direction of the officer who had his arm.

Suddenly, another Officer moved close to Hinson and took him down to the ground.[4] Once Hinson was on the ground facedown, an Officer straddled Hinson's back and appeared to reach down by the side of Hinson's body in a manner that would be consistent with trying to find Hinson's arms so he could cuff Hinson.

About seven seconds later, the same Officer struck Hinson on the back. Two seconds after that, the Officer again struck Hinson on the back. Another second went by, and the Officer struck Hinson on the back a third time. Then, a second later, another Officer struck Hinson in an area consistent with where Hinson's head would have been, had the view not been obstructed. Finally, after another second, the first Officer hit Hinson on the back a fourth and fifth time.

In the next second, that Officer began to sit up and to work with his hands behind Hinson's back. For the next about twenty seconds, the Officer engaged in activity consistent with cuffing Hinson, though the video is of such poor quality that even after reviewing it frame by frame, we cannot confirm with certainty precisely

---

[4] The camera angle designated "overall" offers the best angle of footage for the events after the Officers removed Hinson from his truck. That is wide-angle footage taken from about 47 feet away from where the incident occurred. Unfortunately, however, the events after Hinson was taken to the ground occurred in large part behind what appears to be a two-to-three-foot sign resting on the ground. In addition, because the camera filmed only when triggered by the motion sensor, the video is interrupted by periods where no filming occurred. As a result of these circumstances, it is difficult to discern much detail from the video footage.

what the officer was doing. Nevertheless, the recording reflects nothing inconsistent with the Officers' statements concerning Hinson's takedown and cuffing, and it does not show that any Officer used a flashlight to hit Hinson.

A little while after Hinson was cuffed, another Officer arrived and stood Hinson up. Hinson then fell down. While Hinson was on the ground, the Officer who had stood Hinson up used his foot to apparently tap Hinson's back. About nine seconds after Hinson fell to the ground, two Officers stood Hinson up again and placed him in the patrol car.

### 3.  Hinson's Lack of Memory

As we have noted, Hinson repeatedly insisted at his deposition that he remembered absolutely nothing about his arrest, from the time that he put his hands up while sitting in his truck until he was in the back of the patrol car. In particular, Hinson denied having any memory concerning (1) the Officers' alleged instructions to him to open his door and leave the truck; (2) how he got out of the truck; (3) how handcuffs were put on him; (4) being struck in any way by any officer; (5) whether he resisted arrest in any way after he put his hands in the air; (6) what he did once he was prone on the ground after the takedown; (7) whether he offered his hands for handcuffing; and (8) walking to the patrol car. He further testified that even before he put his hands up, he could not understand what the Officers were saying to him. Finally, he explained that his "entire case rests on" the arrest video.

11

C. The Officers' Interview of Hinson

At the Police Memorial Building, JSO Detectives James Childers and Kevin Munger interviewed Hinson. The evidence from the Officers' interviews[5] of Hinson comes from their sworn declarations, the sworn declaration of Schoonover, and a video recording of the interview. In addition, we recount what Hinson testified to concerning how his wounds felt during the interviews.

### 1. The Officers' Statements

We begin with the Officers' statements. Both Munger and Childers attested that though they observed abrasions to the left side of Hinson's face, Hinson did not appear to them at any time to be in distress or in need of immediate medical treatment. As Childers described the abrasions, they were "road[] rash," and they were not bleeding when he saw Hinson. Childers also asserted that Hinson never requested medical attention or claimed he was in pain during Childers's contacts with Hinson.

Schoonover, who supervised Childers and Munger, stated that he saw Hinson in the interview room where Munger and Childers were interviewing him. After noticing "minor abrasions" on Hinson's face, Schoonover asked the sergeant who was present about them. The sergeant advised Schoonover that Hinson was asked

---

[5] The Officers interviewed Hinson twice. After Hinson's first interview had ended, Hinson asked to speak further with the Officers, so a second interview occurred.

about his facial wounds and had responded that he was "okay." Schoonover explained that he then watched portions of Hinson's interview, and Hinson neither appeared to be in pain nor requested medical attention during the parts Schoonover saw.

### 2. The Video Recording of the Interviews

During the interviews, Hinson and the detectives discussed the abrasions on Hinson's face, though Hinson never complained that he was in pain or asked for medical attention. Childers also asked Hinson whether he was "all right," and Hinson responded that he was.

At some point, Hinson's wife was permitted to visit with him. During that time, the two discussed, among other things, the abrasions on Hinson's face. Hinson's wife repeatedly asked Hinson whether he was "okay." Despite these topics, Hinson never said he was not physically alright, never asked his wife for medical assistance, and never complained that he was in pain.

Our review of the video recordings confirmed that Hinson suffered abrasions to the left side of his face, though the wounds did not appear to be actively bleeding during the interviews. Nor did Hinson seem to be in physical pain or discomfort at any point in the interviews. Hinson also responded calmly and coherently to questions Childers and Munger asked him. At various times during the interview, Hinson rubbed and picked at the abrasions on his face without grimacing or

13

displaying any pain. At other times, Hinson put his head in his hands or on the table—his abrasions making contact with both—and showed no signs of discomfort. Even when Hinson's wife met him in the interview room and wiped the abrasions on his face, Hinson did not react as if he were in pain or required medical attention.

### 3. Hinson's Testimony Concerning His Wounds

In contrast to his statements and conduct during his interviews, at his deposition, Hinson testified that during the interviews, he experienced "[a]ll types of pain" to his face and head. More specifically, Hinson claimed that he suffered "throbbing pain," "sharp pain," and "dull pain" and that his face and head were "sore to the touch." He characterized his pain as a 6 or 7 on a scale of 1 to 10. But he expressly denied feeling pain to any other parts of his body while he was in the interview room.

### D. Hinson's Booking

When Hinson's interviews concluded, Munger and Childers took Hinson to the jail, where he was admitted. According to Childers, admission to the jail meant that the jail's medical staff determined that Hinson had no serious medical need. Had the medical staff reached the contrary conclusion, Childers explained, he would have been required to transport Hinson to the hospital.

Jacqulyne Phillips, a Certified Medical Assistant employed by the City of Jacksonville, was on duty at the jail when Hinson arrived for his medical screening

14

on October 7, 2012.  She created medical records of her evaluation.  These records indicate, "No trauma identified."  They further describe "[w]ound[s] observed" as follows:  "[Hinson] has abrasions to his face, they are minor and not bleeding at this time.  [Hinson] instructed to keep clean with soap and water."  According to Phillips, Hinson denied having any pain when she asked him.  Phillips also attested that Hinson did not appear to be in any pain.  Overall, Phillips determined that Hinson was "not in need of urgent medical attention," so she medically cleared him for admission to the jail.  Hinson's jail medical records do not indicate that he complained of or was found to have suffered a concussion or any other type of traumatic head or brain injury on October 7, 2012.

E.  Other Evidence

After October 7, 2012, Hinson's medical records reflect that his next medical visit occurred eleven days later, on October 18, when Hinson was given a "multiphasic screening exam."  The record of that visit shows that medical staff identified no significant physical findings, including, among other things, specifically with respect to "[i]nspection[s]" of Hinson's abdomen and musculoskeletal system and for skin lesions.[6]  Nor do Hinson's jail medical records indicate that he ever complained of any physical ailments that could have been

---

[6] The examining professional did describe Hinson's mood and affect as "[a]bnormal ([p]oor eye contact)."

related to the events of his arrest.[7]  And though Hinson did report on January 28, 2013, that he was "HAVING SEVERE MANIC EPISODES OF DEPRESSION/ANXIETY LEADING TO LOSS OF APPETITE/SLEEP FOR 5-6 DAYS A WEEK," Hinson claimed in a February 5, 2013, medical visit to address that condition that he suffered from post-traumatic stress disorder, which he attributed to his prior Naval service.[8]

In addition to Hinson's jail medical records, the Officers also submitted a sworn declaration from Valerie Rao, M.D.  Dr. Rao, a medical doctor and board-certified forensic pathologist, licensed by the State of Florida, attested that, among other items, she reviewed photographs of Hinson's injuries taken immediately after his arrest, Hinson's booking photographs, the video recording of Hinson's JSO interview, and Hinson's jail medical records.  Based on her review, Dr. Rao opined that "the injuries sustained by Hinson during the course of his arrest on 10/7/2012 (minor abrasions to the left side of his face) were merely superficial and non-life threatening," and they "did not require medical attention."  She further asserted that

---

[7] Hinson did report a clearly unrelated physical ailment:  on April 3, 2013, and after that, he was treated for a break to bones in his right hand, following a fight at the jail.

[8] The records from that medical visit state that Hinson reported "symptoms of mood[] swings and sleep disturbance since his service time in the Navy" and that he advised the health professional at the jail that he was a "disabled veteran" and "fe[lt] like people [were] plotting on [him] all the . . . time."  He explained that he had witnessed "dramatic events and casualties, death, suicides" during his time in the Navy.  The records do not indicate that he mentioned his October 7, 2012, arrest experience when he discussed his mental-health concerns.

16

"[t]he abrasions [were] not consistent with being punched, kicked, or beaten with a flashlight or [with] knee strikes."

Finally, we turn to Hinson's deposition.  During his deposition, Hinson discussed his sense of hearing.  He explained that the Veterans Administration had diagnosed him with hearing loss.  According to Hinson, he experienced hearing loss in both ears as a result of his Naval service.  Hinson noted that he had slept over the torpedo tube, where "it was very loud, . . . one of the loudest things that [he had] experienced constantly."  In addition, Hinson complained of ringing in his ears.  And while Hinson was not willing to rule out other contributors to his hearing problems, he did not identify any possible reasons for it other than his Naval service.

## II.  Procedural History

Hinson filed a *pro se* action under 42 U.S.C. §1983 against Bias, Anderson, Kremler, Williams, and Schoonover (collectively, the "Officers").  In a verified complaint, he alleged that the Officers each violated his Fourth Amendment right against the use of excessive force and his Eighth Amendment right to be free from deliberate indifference to medical needs.

In support of his Fourth Amendment claim, as relevant to Hinson's appeal, Hinson alleged that Bias removed him from his truck and "SLAMMED HIM ON THE GROUND."  Compl. at 6.  He further contended that after the Officers handcuffed him, Bias and Anderson "ASSAULT[ed] [him] FOR NO JUST

17

CAUSE." *Id.* In particular, Hinson averred that they "REPEATEDLY BEAT[] [him] WITH FLASHLIGHTS AND KICKED [him] . . . WHILE [he was] IN HANDCUFF[]S AND LAYING ON HIS STOMACH." *Id.* at 7. In addition, Hinson complained that Kremler and Williams, who were present at the scene but not participating in the alleged beating, failed to intervene to stop it. *Id.* at 5. Despite these allegations, Hinson conceded in the complaint that he "[did] NOT REMEMBER THE MAJORITY OF THE DEFENDANTS['] ASSAULT," though he asserted that circumstance was attributable to having been "KNOCKED UNCON[S]CIOUS FROM THE DEFENDANTS['] EXCESSIVE USE OF FORCE." *Id.* at 7.

As a result of this alleged violation, Hinson averred, he "SUFFERED MULTIPLE LACERATIONS, BRUISES AND SWELLING ON THE SIDE OF HIS FACE AND UPPER PARTS OF HIS BODY. [He] ALSO SUFFERED INJURIES TO HIS EAR AND NOW HAS CHRONIC MIGRAINES . . . ." *Id.*

As for Hinson's Eighth Amendment claim, Hinson asserted that he "WAS BLEEDING FROM THE SIDE OF HIS FACE AND NEED[ed] MEDICAL ATTENTION." *Id.* According to the complaint, Hinson "NEED[ed] OBVIOUS MEDICAL CARE." *Id.* And because he did not receive it, Hinson contended, he "SUFFERED FURTHER INJURY AND PHYSICAL, EMOTIONAL AND P[]SYCHOLOGICAL PAIN AND INJURY." *Id.*

18

As relief for these alleged violations, Hinson sought, among other remedies, "A SUM TOTAL NO LESS THAN 4.5 MILLION DOLLARS." *Id.* at 9.

Following discovery, the Officers filed summary-judgment motions, invoking qualified immunity. After Hinson responded, the district court granted Schoonover's motion as it concerned Hinson's Fourth Amendment claim, since Schoonover was not present for the arrest and therefore could not have intervened. But the district court denied the Officers' summary-judgment motions in all other respects, concluding that material issues of fact existed, so the Officers were not entitled to qualified immunity.

The Officers now appeal.

## III. Standard of Review

We review *de novo* district-court orders on summary judgment, taking the facts in the best light to the nonmoving party and drawing all reasonable inferences in that party's favor. *Glasscox v. City of Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). But while all reasonable inferences must be drawn in favor of the nonmoving party, "an inference based on speculation and conjecture is not reasonable." *Hammett v. Paulding Cty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) (citation and internal quotation marks omitted).

Summary judgment should be granted only if the evidence of record yields no genuine dispute of material fact, and the moving party is entitled on the undisputed

material facts to judgment as a matter of law. Fed. R. Civ. P. 56(a). Yet a "mere scintilla of evidence" cannot suffice to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present enough evidence to allow a jury to reasonably find in its favor. *Id.*

When a party properly supports a motion for summary judgment, the nonmoving party must come forward with "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id.* at 256. It is not enough for the nonmoving party to "merely assert[] that the jury might, and legally could, disbelieve" the moving party's evidence. *Id.* Instead, the nonmoving party must present "affirmative evidence" that would allow a reasonable jury to rule for him. *Id.* at 257.

## IV. Discussion

As we have noted, Hinson lodged a claim for excessive force under the Fourth Amendment and a claim for deliberate indifference to medical needs under the Eighth Amendment against Defendant Officers. In their motions for summary judgment, Defendant Officers invoked qualified immunity.

The qualified-immunity doctrine seeks to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

20

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To resolve this balance, the doctrine protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

We have explained that qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted). Nevertheless, the doctrine's protections do not cover an officer who "knew or reasonably should have known" that his actions taken under color of law would violate the plaintiff's constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). The term "discretionary authority" covers "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, Defendant Officers readily satisfied this requirement, as they undertook all the

21

challenged actions while on duty as police officers conducting arrest and investigative functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to Hinson to demonstrate that qualified immunity is inappropriate. *See id.* To do that, Hinson must show that, when viewed in the light most favorable to him, the facts demonstrate (1) that Defendant Officers violated Hinson's constitutional right and (2) that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant Officers' actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223. We may decide these issues in either order, but to survive a qualified-immunity defense, Hinson must satisfy both showings. *Maddox*, 727 F.3d at 1120-21 (citation omitted).

A. Defendant Officers are entitled to qualified immunity on Hinson's Fourth Amendment excessive-force claim

We begin by considering whether the Officers violated Hinson's Fourth Amendment right to be free from the use of excessive force. As relevant here, the Fourth Amendment protects against "unreasonable . . . seizures." U.S. Const. amend. IV. The use of excessive force in executing an arrest is a species of unreasonable seizure, so the Fourth Amendment prohibits it. *See Lee*, 284 F.3d at 1197.

Here, Hinson has challenged the actions of both the Officers who participated in taking him to the ground and striking him and the Officers who were present but did not participate in the use of force. If the participating Officers violated Hinson's rights and the non-participating Officers were in a position to take reasonable steps to protect Hinson but did not, the non-participating Officers are equally liable as the participating ones, based on their nonfeasance. *Crenshaw v. Lister*, 556 F.3d 1283m 1293-94 (11th Cir. 2009) (per curiam).

The Fourth Amendment's "objective reasonableness" standard governs our inquiry. *Crenshaw*, 556 F.3d at 1290 (citation omitted). Under this standard, we must consider "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)) (internal quotation marks omitted). When we conduct our analysis, we must do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted), and we acknowledge that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citation omitted).

In applying this standard, we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

23

governmental interests at stake." *Crenshaw*, 556 F.3d at 1290 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  We have explained that "the amount of force used by an officer in seizing and arresting a suspect must be reasonably proportionate to the need for that force." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017) (cleaned up).  Factors we account for in making this assessment include (1) the severity of the crime; (2) whether the individual "poses an immediate threat to the safety of the officers or others," *Crenshaw*, 556 F.3d at 1290 (quoting *Graham*, 490 U.S. at 396) (quotation marks omitted); (3) whether the individual actively resists or tries to evade arrest by flight, *id.*; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury.[9]

We have further elaborated on some of these factors.  For example, "[t]he nature and extent of physical injuries sustained by a plaintiff" can be relevant in evaluating "whether the amount and type of force used by the arresting officer were excessive." *Stephens*, 852 F.3d at 1325 (emphasis omitted).  Nevertheless, we have cautioned that "[w]hen more force is required to effect an arrest without endangering

---

[9] At times in our caselaw, we have identified another factor:  whether officers applied force "in good faith or [rather did so] maliciously and sadistically." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)).  As we explained in *Mobley v. Palm Beach County Sheriff Department*, 783 F.3d 1347, 1354 (11th Cir. 2015), however, that caselaw is not correct.  Because the test we apply asks whether an officer's actions in using force were objectively reasonable, the test is not a subjective one. *Id.*  So we do not consider an officer's subjective intent in applying force. *Id.*

officer safety, the suspect will likely suffer more severe injury, but that alone does not make the use of that amount of force unreasonable." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (per curiam).

### 1.  *The Applicable Facts*

We now consider these principles in light of the facts before us.  But before we can analyze whether the force used here was excessive under the Fourth Amendment, we must first identify the facts to which we apply our analysis.  Here, Hinson himself remembers nothing about the arrest,[10] and no witnesses other than the Officers have filed statements concerning the arrest.

Hinson complains that the Officers employed excessive force in three ways: they "SLAMMED HIM TO THE GROUND"; they "REPEATEDLY BEAT[] [him] WITH FLASHLIGHTS"; and they kicked him "WHILE [he was] IN HANDCUFF[]S AND LAYING ON HIS STOMACH."  Hinson also alleges in his complaint that he cannot recall what the Officers did during the arrest because he was "KNOCKED UNCONSCIOUS FROM THE DEFENDANTS['] EXCESSIVE USE OF FORCE."

As we have noted, we view all facts and draw all reasonable inferences in favor of the non-moving party when reviewing a summary-judgment ruling.

---

[10] According to Hinson's recorded post-arrest interview statements, he also remembers nothing about the murder earlier that evening.

25

*Glasscox*, 903 F.3d at 1212.  This means that we normally take as true the testimony of the non-moving party and adopt his version of the facts in a qualified-immunity case.  *See Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

But here, we cannot do that since Hinson admits that he has no memory of any events after he placed his hands up while sitting inside his truck.  Of course, we would not want to reward an officer for unlawfully engaging in actions that rendered the arrestee unable to rebut the officer's version of events.  So, that Hinson cannot personally rebut the Officers' story does not mean that we must necessarily accept the Officers' version of events.  *Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015).  Rather, we must "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts."  *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)) (quotation marks omitted).  Where circumstantial or other evidence, if believed, "would tend to discredit the police officer's story," or where such evidence "could convince a rational factfinder that the officer acted unreasonably," we do not simply accept the officer's account.  *Id.* (quoting *Henrich*, 39 F.3d at 915) (quotation marks omitted).  Instead, where the circumstantial evidence supports a dispute of material fact, we must conclude that summary judgment is inappropriate and allow the case to proceed to trial.  *See id*. (collecting cases).

26

Here, the other evidence consists of the video footage, Hinson's medical records, and Hinson's deposition testimony. So if sufficient evidence exists for Hinson to withstand summary judgment on the Fourth Amendment qualified-immunity inquiry, it must come from those sources or inconsistencies in the Officers' testimony. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1214 & n.1 (11th Cir. 2009) (where plaintiff did not remember what occurred during his arrest or while at police station, the court looked to statements of police officers and relevant surveillance video).

We begin with the video recording. It reflects that Anderson did indeed take Hinson to the ground. But it does not show that Bias or Anderson beat Hinson with a flashlight or that they kicked him. Indisputably, Bias struck Hinson five times, and Anderson struck him once. But each Officer used his fist to inflict the strikes. And one Officer did inexplicably touch the front of his shoe to Hinson's back while Hinson was on the ground, but the recording does not, by any measure, show a kick. Nor does the medical evidence provide any indication that an Officer beat Hinson with a flashlight or kicked Hinson in the back. Indeed, the record contains no evidence that Hinson suffered a cracked skull, cracked or broken bones, or even bruises in the areas where he was allegedly beaten with a flashlight and kicked in the back. It is difficult to conceive of how strikes to the body and head with a flashlight or a kick to the back would not leave a mark.

27

Since the record lacks evidence of flashlight strikes or kicks, the allegedly excessive acts we must evaluate consist of Anderson's takedown of Hinson, Bias's five fist strikes of Hinson, and Anderson's single fist strike of Hinson. Significantly, though, in evaluating the Officers' actions, we must accept as true all evidence the Officers have submitted that Hinson does not contest and that Hinson's evidence—the video recording and medical records—does not contradict. *See Beshers*, 495 F.3d at 1262 n.1 (citing *Scott*, 550 U.S. at 372). We also do not accept Hinson's version of events where the video recordings flatly contradict them. *See Id.* ("[T]o the extent [a party's] version of the facts is clearly contradicted by [video recordings], such that no reasonable jury could believe it, we do not adopt [that party's] factual allegations.")).

So here, these rules mean we must credit the Officers' statements that Hinson repeatedly ignored their instructions to put his hands up, to keep his hands up, to leave his truck, to stop moving towards the officer behind him after he got out of his truck, and to release his hands from underneath him so an officer could restrain them in handcuffs. As we have noted, though the surveillance video lacks audio, the time stamp on the video shows that more than ample time passed between the Officers' alleged commands to Hinson and either Hinson's eventual responses or the Officers' resulting actions for Officers to have repeatedly given Hinson the instructions to which they all attested, in the interlude. Plus, Hinson does not assert that the Officers

28

did not so instruct him or that he cooperated. And we likewise have found nothing in the record to suggest that the Officers did not direct Hinson in the manner they claim or that Hinson did not fail to comply. So based on the uncontroverted video evidence and Officers' statements, we must assume that the Officers did so instruct Hinson and that Hinson did not initially comply.

As for whether the Officers knocked Hinson unconscious in the course of the force they applied, we cannot tell either way from looking at the video. Nevertheless, the Officers did not attest that they did not knock him unconscious. So since we are reviewing Hinson's case on the Officers' motion for summary judgment, we will assume without deciding that they did.

### 2.  *Application of the Fourth Amendment Factors*

Having identified the universe of facts on summary judgment, we must apply the six Fourth Amendment excessive-force factors. Here, the crime was extremely serious:  a man had just been knifed to death, apparently without provocation. The Officers also observed blood on Hinson's hands and shirt, which tended to corroborate the idea that Hinson was the one who had stabbed the victim. In addition, Hinson matched the physical description of the suspect that a witness had provided.

And when Officers encountered Hinson, they had every reason to believe he was still armed. Even if the Officers saw or heard Hinson drop a knife out his front

window, they had no way of knowing whether he had other weapons inside the truck with him.[11] (As it turned out, Hinson did have another knife inside the truck, tucked between his seat and the center console.). Hinson was also in a functioning vehicle. Particularly in light of his erratic behavior at Fionn MacCool's, the Officers reasonably believed that Hinson posed a substantial and immediate threat to their safety and that of others. Notably, Hinson had also repeatedly failed to comply with nearly all of the Officers' simple instructions, making him seem even more unpredictable to a reasonable officer. On these facts, a reasonable officer could feel a compelling need to apply force to obtain control of Hinson and ensure he did not hurt himself, the Officers, or others.

As for the proportionality of the force to the need for it, we first consider Anderson's takedown of Hinson. As we have noted, immediately before Anderson took Hinson to the ground, Hinson failed to comply with the Officers' instructions to stop moving back towards Bias. And he did this after repeatedly ignoring the Officers' prior instructions to put his hands up, to keep them up, and to exit the truck. So the Officers were faced with a man who had just apparently slashed the victim in

---

[11] The fact that Anderson attested that the knife dropped from Hinson's lap when, in reality, Hinson dropped the knife out his window could perhaps, on a different record, allow a reasonable jury to conclude that Anderson had lied, and if he had lied about that, that he had lied about other things. But here, there is nothing to support Hinson's version of the facts concerning his arrest, and whether the knife was dropped out the window or dropped from Hinson's lap makes no difference to the reasonableness of the Officers' decisions during the course of Hinson's arrest. Therefore, this one inconsistency between the Officers' statements and the video recording of the arrest cannot save Hinson from summary judgment.

30

the throat without provocation; they had no way of knowing whether he remained armed; they had just seen him fail repeatedly to comply with their instructions; and in violation of the Officers' instructions, he was moving towards an unarmed Officer who was already in close proximity to him. Under these circumstances, a reasonable officer could conclude that the amount of force Anderson applied in taking Hinson to the ground was appropriate, in light of the need to prevent what reasonably could have appeared to be imminent harm to Bias, since Hinson continued to move towards him.

We now turn to the strikes the Officers inflicted on Hinson while he was on the ground. According to the Officers' uncontradicted attestations, Bias was straddling Hinson, trying to handcuff him. Bias repeatedly instructed Hinson to give Bias his hands, and Hinson once again failed to comply. So, Bias explained, he became concerned that Hinson was trying to get a weapon while his hands were under his body. To avert that from possibility, Bias inflicted hammer strikes to Hinson's body, along with interceding repeated instructions to Hinson to make his hands available to Bias for cuffing. After the third such strike, when Hinson was continuing to ignore Bias's instructions, Anderson used a "pain-compliance" hand strike to Hinson's head in an effort to obtain compliance. As soon as Hinson gave his hands to Bias, no further blows occurred.

31

Once again, in the situation confronting the Officers, the Officers knew that for no apparent reason, Hinson had just stabbed the victim in the throat; they had no way to be sure he was not still armed at the time; he had repeatedly failed to comply with their instructions; and it seemed like he may have been trying to get his hands on a weapon while Bias was trying to cuff him. Under these circumstances, we cannot say that the fist blows the Officers used to get Hinson to follow the instructions to produce his hands for cuffing inflicted an unreasonable amount of force in light of the need to maintain the safety of Officers and others.

And this is particularly true when we consider the last Fourth Amendment excessive-force factor: the severity of the injuries. Here, photographic evidence shows abrasions around Hinson's left eye and forehead, as well as a small bruise on the part of Hinson's right knee that abutted the ground while Bias tried to handcuff him. Hinson's medical records from his admission to the jail reflect nothing further and describe Hinson's abrasions as "minor and not bleeding" at that time. And Dr. Rao opined that Hinson's only injuries were "merely superficial and non-life threatening" and "not consistent with being punched, kicked, or beaten with a flashlight . . . ." Hinson's jail medical records also show that Hinson's injuries healed soon after his admission to the jail.

When we account for all of the Fourth Amendment excessive-force factors, then, we must conclude that the Officers' conduct in taking Hinson to the ground

and fist-striking him were objectively reasonable uses of force on this record. As a result, the Officers did not violate Hinson's Fourth Amendment right to be free from the use of excessive force in securing his arrest. Since Hinson cannot show a violation of his Fourth Amendment right, the Officers are entitled to qualified immunity on Hinson's Fourth Amendment claim.

And since no Fourth Amendment violation was established, the Officers who allegedly failed to intervene to stop the use of force in Hinson's arrest are also entitled to qualified immunity.

B. Defendant Officers are entitled to qualified immunity on Hinson's Eighth Amendment claim of deliberate indifference to medical need.

In evaluating whether the Officers are entitled to qualified immunity on Hinson's Eighth Amendment claim of deliberate indifference to medical needs, we again begin our analysis by determining whether Hinson established that the Officers committed an Eighth Amendment violation.

Among other functions, the Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend VIII. Deliberate indifference of a medical need violates the Eighth Amendment because it amounts to "the unnecessary and wanton infliction of pain. . . ." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up). To set out a claim for deliberate indifference to medical need, Hinson must make three showings: (1) he had a serious medical need; (2) the Officers were deliberately

33

indifferent to that need; and (3) the Officers' deliberate indifference and Hinson's injury were causally related. *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019).

We have explained that a "serious medical need" is an injury or condition that a physician has diagnosed as requiring treatment or that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (cleaned up). To qualify as a "serious medical need," an injury or condition, if not treated, must create a "substantial risk of serious harm." *Id.* (cleaned up). For example, we have concluded that a freely bleeding cut that created a pool of blood on the ground and required stitches presented a serious medical need. *See Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (per curiam). We have also found broken bones to constitute a serious medical need. *Brown v. Hughes*, 894 F.2d 1533, 1538-39 (11th Cir. 1990) (per curiam). And depending on the circumstances, severe pain that is not promptly or adequately treated can present a serious medical need. *McElligott v. Foley*, 182 F.3d 1248, 1255-59 (11th Cir. 1999).

Here, Hinson's claim fails at the first step. Hinson has not identified evidence establishing a serious medical need constitutionally requiring more prompt treatment than Hinson received. As we have noted, Hinson unfortunately experienced skin abrasions on his face and a bruise on his knee. But Childers attested that when he interviewed Hinson at the police station following Hinson's arrest, Hinson was not actively bleeding. The video recording of Hinson's interview appears to corroborate

34

Childers's assessment. And when Childers asked Hinson whether he was "alright," Hinson responded that he was.

Similarly, when Hinson's wife visited, although the two discussed his abrasions, Hinson never said he was not physically alright, never asked for medical assistance, and never complained he was in pain. Nor does the video recording of Hinson's interaction with his wife suggest in any way that Hinson was in pain or even uncomfortable. Rather, the video shows Hinson's wife wiping at the abrasions without any complaint by Hinson. Other video footage shows Hinson repeatedly touching and picking at his wounds without any indication of pain.

Hinson's jail medical records also do not reflect he presented with a serious medical need. The health professional who screened Hinson when he was admitted to the jail indicated "[n]o trauma identified" and described Hinson's wounds as "minor and not bleeding at this time." As treatment, she directed only that he keep the wounds clean, using soap and water. And she reported that Hinson denied having any pain when she asked him.

Finally, as we have noted, after reviewing Hinson's records and the video recording of Hinson's interview, Dr. Rao concluded that Hinson's wounds "were merely superficial and non-life threatening" and that they "did not require medical attention."

To be sure, Hinson testified during his deposition that he suffered "throbbing pain," "sharp pain," and "dull pain" and that his face and head were "sore to the touch." But Hinson never did anything during the interview to convey those feelings to the Officers who questioned him or to anyone else. On the contrary, when asked specifically if he was "alright" and "okay" and if he had any pain, he never indicated he was in pain or distress in any way. For this reason, and because Hinson did not exhibit an injury or condition that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," he has not established that he had a serious need that required medical attention.

And even if Hinson could somehow get past the serious-medical-need element, he has not shown that any failure to treat or delay in treatment of any injuries he experienced during his arrest caused further injury or worsened his condition. True, Hinson asserted in his Complaint that he "SUFFERED INJURIES TO HIS EAR AND NOW HAS CHRONIC MIGRAINES" and that, because he did not receive necessary and timely treatment for the injuries inflicted during his arrest, he "SUFFERED FURTHER INJURY AND PHYSICAL, EMOTIONAL P[]SYCHOLOGICAL PAIN AND INJURY."

But during his deposition, Hinson identified only his prior Naval service as a cause of his hearing condition, chalking up the ringing in his ears and his hearing loss to having slept over the torpedo tube on the submarine where he served. Nor

36

did Hinson present any medical evidence suggesting a link between the delay of treatment for any injuries he experienced during his arrest, on the one hand, and his ear-related problems, on the other.

Similarly, Hinson's jail medical records reflect that Hinson claimed in a February 5, 2013, mental-health-related medical visit that he suffered from post-traumatic stress disorder, which he attributed to his prior Naval service. As with the hearing issues, Hinson presented no evidence suggesting that any delay of treatment for any injuries he suffered during his arrest affected his mental health.

So Hinson's deliberate-indifference claim fails independently for the reason that he did not satisfy the causation requirement. Because the record does not support the conclusion that Hinson suffered a violation of his Eighth Amendment right to be free from deliberate indifference to a medical need, the Officers are entitled to qualified immunity on this claim.

## V. Conclusion

At the end of the day, the proof is in the video recordings in this case. Or more accurately, the proof of Hinson's case is not in the video recordings here. Those video recordings simply do not, in any material way, contradict the Officers' version of what occurred during and after Hinson's arrest. Based on those facts, we cannot conclude that the Officers violated either Hinson's Fourth Amendment right to be free from the use of excessive force in effecting an arrest or his Eighth

Amendment right to be free from deliberate indifference to medical needs. For these reasons, the Officers are entitled to qualified immunity, and the order of the district court must be vacated.

**VACATED AND REMANDED.**