[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14492

_____

EDDIE JAMES KING,

Plaintiff-Appellant,

*versus*

DR LAWSON,
Dooly State Prison,

Defendant-Appellee,

DR SHARON LEWIS
MEDICAL DIRECTOR OF GDC, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:17-cv-00303-TES-CHW

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Eddie James King appeals from the district court's order granting Nurse Kristie Lawson's motion for summary judgment on King's deliberate indifference claim. On appeal, King argues that the district court erred in finding that Lawson was entitled to qualified immunity because she violated King's constitutional rights and the law was clearly established. After careful review and with the benefit of oral argument, we affirm.

**I.**

In 2016, Kristie Lawson worked as a family nurse practitioner in the infirmary at Dooly State Prison. As a nurse practitioner, Lawson was not a specialist in any particular medical field. As a result, part of her job at the prison was to determine whether an inmate needed medical treatment by a specialist. If so, Lawson would write a consult request for an inmate to see a specialist, but after that point, she played no further role in the approval, appointment, or transportation process. Instead, her request had to be reviewed by the prison's medical director. If approved, it was then examined by the Georgia Department of Corrections ("GDC")

Utilization Management ("UM") team, which would, in turn, decide whether to grant it, and if so, where and when to schedule the appointment.

On June 29, 2016, Eddie King, an inmate at Dooly State Prison, visited Nurse Lawson at the prison infirmary to address concerns he had about his right eye. According to Lawson's treatment notes, King told her that day that it felt like something was covering his right eye and he needed "to see the eye doctor." King adds -- in his briefing in district court and in this Court -- that from his first appointment onward, his right eye was "red and watering" and he complained of eye pain. Lawson promptly filled out a physician's order request directing the prison to schedule an appointment for King to see an optometrist, noting that he "must see" the optometrist at his or her "next visit" to the prison. Nothing came of that request.

On July 13, 2016, King returned to the prison infirmary and told the nurse that his vision was blurry and he was still having problems with his right eye. Again, Lawson recommended that King see the optometrist and put another note in his chart recommending this course of conduct to her superiors.

On August 3, 2016, King saw Lawson once again and King told her that the vision in his right eye was worse -- he now complained of floaters and black lines in his line of vision -- and he had still not yet seen the optometrist. After this meeting, Lawson submitted a request for King to see an ophthalmologist from outside the prison and this time, the nurse marked the request as "urgent."

The prison medical director, and then the GDC UM team, approved the request by the next day, August 4, 2016, and scheduled King for an ophthalmology appointment on August 18, 2016.

Before his ophthalmology appointment, however, King's vision deteriorated further and he returned to Nurse Lawson on August 15, 2016, complaining that he could not see out of his right eye. Lawson told King she had already put in the ophthalmology request for him and that she had no control over scheduling the appointment. King saw the ophthalmologist on August 18, as the prison team had directed, but by the time of that appointment, he says -- again, in his briefing -- that he was blind in his right eye. King has since said in his briefing that the retina of his right eye had become detached due to a delay in his treatment and had caused blindness in that eye.

Proceeding *pro se*, King sued Nurse Lawson in the Middle District of Georgia for violating 42 U.S.C. § 1983 for deliberate indifference to King's medical needs, in violation of the Eighth Amendment.[1] Lawson later moved for summary judgment, arguing that King could not prove deliberate indifference or, in the alternative, that she was entitled to qualified immunity. The district court agreed. It found that while King had adequately established that his vision problem constituted a serious medical need, he failed

---

[1] King also raised deliberate indifference claims against other state officials, including GDC Medical Director Sharon Lewis, physician's assistant Stifanos Almedom, and the prison medical director, Jennifer Mason. Only his claim against Nurse Lawson, however, is before the Court in this appeal.

to show that Lawson was deliberately indifferent to that need, or that any such indifference caused his vision loss.

King timely appealed, and a panel of our Court appointed counsel for King on appeal.[2]

## II.

We review a district court's decision on summary judgment *de novo* and apply the same legal standard used by the district court. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017). Summary judgment is appropriate if, after drawing all reasonable inferences in King's favor, "there are no genuine issues of material fact." *Id.* To survive summary judgment, then, King must identify some "'affirmative evidence' that would allow a reasonable jury to rule for him" on his deliberate indifference claim. *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III.

To invoke qualified immunity, a public official must first establish that she was acting within the scope of her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013).

---

[2] Attorney Carolyn Burch was appointed to represent King. We commend Attorney Burch for accepting this appointment and representing her client with vigor and care.

The term "discretionary authority" covers "all actions of a governmental official that (1) were undertaken pursuant to the performance of [her] duties, and (2) were within the scope of [her] authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted).

Once the defendant establishes that she was acting within the scope of her discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. *Maddox*, 727 F.3d at 1120. Overcoming the defendant's qualified immunity defense involves a two-part inquiry. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). The plaintiff must show that: (1) "the defendant's conduct violated a statutory or constitutional right," and (2) "the violation was clearly established." *Id.* (internal quotation marks omitted). We can decide these issues in either order, but the plaintiff must make both showings in order to survive a qualified immunity defense. *Hinson*, 927 F.3d at 1116.

First, the parties do not dispute that when King visited Nurse Lawson in the prison infirmary about his eye problem she was acting within the scope of her discretionary authority. So, the burden shifts to King to demonstrate that qualified immunity is inappropriate. *Maddox*, 727 F.3d at 1120. King argues that Lawson violated his Eight Amendment rights by acting with deliberate indifference to his medical needs and that his rights were clearly established at the time.

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they

receive when they are incarcerated. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has interpreted the Eighth Amendment to prohibit "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment deliberate indifference claim, a prisoner must: (1) "satisfy the objective component by showing that [he] had a serious medical need"; (2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; *and* (3) "as with any tort claim, . . . show that the injury was caused by the defendant's wrongful conduct." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

Applying this well-recognized three-part test to King's claim, we agree with the district court that he has not established a constitutional violation. We begin, however, by recognizing that King has shown that the blindness in his right eye is a "serious medical need" under the first part of the test. "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)). Either way, to violate constitutional standards, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (alteration omitted) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). A serious medical need can also be determined by "whether

a delay in treatment exacerbated the medical need or caused additional complications." *Id.*

Of course, the need to treat a serious eye infirmity, let alone blindness is "so obvious that even a lay person would easily recognize" it. *See id.*; *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) ("Although blindness in one eye is not life-threatening, it is no trifling matter either. It is not a bump or scrape or tummy ache. Monocular blindness is the loss of the function of an organ."). And, in fact, Nurse Lawson assumes on appeal that "King's eye condition presented an objectively serious risk of injury."

But even if we accept that King's eye condition in his right eye presented a serious medical need under the first part of the deliberate indifference test -- as we do -- he still must satisfy the remaining two parts of the test. Both are necessary. We need only address the last one, however -- whether there is a genuine dispute of material fact concerning whether Lawson's treatment, or delay in treatment, caused King's injury -- in order to decide this appeal. On the record before us, there is not. King has offered *no* evidence of causation, let alone medical evidence.

Our inquiry into causation asks "whether an official's acts or omissions were the cause -- not merely a contributing factor -- of" the constitutional violation. *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993). A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation. *Goebert*, 510 F.3d at 1327. Where,

21-14492                 Opinion of the Court                 9

as here, a prisoner argues that his injury was caused by a delay in treatment, he "must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188, 1190 (11th Cir. 1994) (requiring medical evidence to "establish the detrimental effect of delay in medical treatment"), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) ("To survive summary judgment in a case alleging deliberate indifference, a plaintiff must produce sufficient evidence of[, among other things,] causation.") (internal quotation marks omitted)).

Here, King has not offered any evidence, let alone medical evidence, to establish that Nurse Lawson's conduct caused the blindness in his right eye. As we've already laid out, Nurse Lawson took steps to address King's complaints about his eye from the very beginning, at every visit, responding each time by recommending to her superiors that King be referred to an eye specialist. At each of King's first two appointments, he complained about blurry vision and requested "to see the eye doctor." Lawson immediately put in a requested order that King "must see" the optometrist on his or her next visit to the prison, and Lawson added another one for good measure two weeks later. King returned to the infirmary in three weeks, reporting not only blurry vision but also having "floaters or black lines in line of vision." This time, Lawson changed course, submitting an "urgent" request for a consultation with an ophthalmologist. Within two weeks, King was transported to be evaluated by Dr. Lane Ulrich, an ophthalmology specialist.

The medical records before us thus detail King's appointments with Nurse Lawson, and they detail the steps she took to secure the appropriate treatment for him. They do not, however, indicate that her conduct caused his vision loss.

For starters, King has not presented any evidence in the record to explain what caused his vision loss or what could have prevented it. Thus, by way of example, there is no evidence in the record to establish that King in fact suffered a detached retina, and if so, how it may have arisen or whether it caused his blindness. Nor do we know that Lawson's initial referrals to the optometrist could not have addressed his eye problem, had an appointment taken place. Nor is there any evidence that an appointment with the ophthalmologist, when Lawson first requested it, could not have addressed the issue. Nor is there anything to suggest that Lawson could have accelerated an appointment with either specialist by making an "urgent" request sooner. Rather, the undisputed record reflects that Lawson played "no . . . role" in securing treatment after she referred the prisoner to a specialist, so it is unclear whether an urgent request, without any significant medical history to accompany it, would have moved the process along. Nor, most importantly, do we even know if an *ophthalmology* appointment when King *first* went to the infirmary could have prevented his vision loss. The bottom line is, even if it were within Nurse Lawson's power to have immediately secured an appointment with an eye specialist for King during his first or second visit, there is no evidence that it would have made a difference.

Furthermore, King has offered no evidence that Lawson could have done something more herself to treat him. As the undisputed record confirms, Lawson was not an eye specialist, and King has not proposed any particular treatment she could or should have offered herself. A defendant cannot be causally responsible for a plaintiff's injury if the injury "could not have been alleviated by her." *Hill*, 40 F.3d at 1190. And on this record, we cannot see how Lawson herself could have done anything more than she did to alleviate King's eye condition.

King's brief offers only conclusory statements in response. He insists, for example, that Lawson's "delay in referring him to a specialist caused blindness in his right eye" and her "lack of treatment for five weeks caused [him] to continue to suffer eye pain." But setting aside that the injury at issue is King's blindness -- not his eye pain -- we've already explained that, according to the undisputed record, Lawson did treat him by making prompt requests for referrals, and he's presented no evidence that, had she taken other or quicker avenues, his right eye would not have gone blind.

It's also worth noting that "[s]tatements . . . in briefs are not evidence." *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) (citation omitted). As we've said:

> When a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but by affidavits, depositions, answers to interrogatories, and admissions must

show that there are specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). Although we must view factual inferences favorably toward the nonmoving party and pro se complaints are entitled to a liberal interpretation by the courts, we hold that a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment.

*Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (citations omitted) (affirming the grant of summary judgment in a § 1983 case where the plaintiff had "not submitted a doctor's diagnosis or any medical evidence supporting his allegations that the City of Miami drinking water at Dade County Jail caused his stomach pains and headaches").

This means that the conclusory claims King makes about causation in his brief on appeal -- that the five weeks of "no treatment" *must have caused* his eventual right-eye blindness -- do not raise a "genuine issue" about causation for purposes of summary judgment. Nor can we find anything in the trial court record to support the argument. On appeal, he cites only to his own briefing in the district court, which similarly does not raise a "genuine issue" about causation. *Id.*

What's more, even if we were somehow able to consider the statements in King's briefing for purposes of summary judgment, they would not carry the day.  In his filings, King includes claims that, for example, "[t]he retina had detach[ed] from the eyeball" and "we all know the longer you prolong a problem the worse it get[s]," and "[his] retina detach[ed] from the eyeball because of delay."  But as we've explained many times, "[c]onclusory allegations and speculation" like those found in King's briefing are legally "insufficient to create a genuine issue of material fact" and prevent summary judgment.  *See, e.g.*, *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")); *see also Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1306 (11th Cir. 2023) (per curiam); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).  This is especially true in this case, where, in order to defeat summary judgment on his deliberate indifference claim, King needed to "place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment." *Hill*, 40 F.3d at 1188.  He has not done so.

The most King can say is that "doctors will testify that the delay in treatment caused his blindness in his right eye."  Presumably, he is claiming that he could later provide the testimony of a doctor at a trial.  But although King was acting *pro se* in district court, that did not absolve him from offering competent evidence,

including medical opinions, to defeat Lawson's motion for summary judgment. *Brown*, 906 F.2d at 670. The only record support for his general and vague claim about potential medical opinions is found in a citation to one of his briefs presented in the district court, which again only offers the same conclusory and unsupported statement. Again, this is not evidence. *See id.*; *Travaglio*, 735 F.3d at 1270.

In short, there is no genuine dispute of material fact concerning whether Nurse Lawson caused King's right-eye blindness, nor, in turn, whether she violated King's constitutional rights. As a result, we need not and do not reach the second part of the qualified immunity inquiry. *See Hinson*, 927 F.3d at 1116. Accordingly, we affirm the district court's grant of summary judgment in favor of Nurse Lawson.

**AFFIRMED.**